[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11632
_____

D.C. Docket No. 1:12-cv-00740-AT


ESTELLE SMITH,
as surviving spouse of Dirk Smith, et al.

Plaintiffs-Appellees,
Cross-Appellants,


versus

RICHARD L. LEPAGE, JR.,
individually and in his official capacity as a
Dekalb County Police Officer, et al.,

Defendants-Appellants,
Cross-Appellees.


_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(August 25, 2016)

Before MARTIN and JORDAN, Circuit Judges, and COOGLER,[*] District Judge.

MARTIN, Circuit Judge:

This case results from a March 2010 encounter between DeKalb County police officers and Dirk Smith at his DeKalb County home. The officers ultimately shot and killed Mr. Smith, and this suit for damages was brought by his surviving wife and children. On the day he was killed, Mr. Smith broke into his own house because he had forgotten his keys when returning from vacation. The babysitter called the DeKalb County Police Department, and responding officers entered the Smith home without a warrant. When the officers found Mr. Smith, he was holding a kitchen knife that he refused to put down, so they tasered him. According to the record here, Mr. Smith dropped the knife, ran into his bathroom, and refused to come out. When he eventually did come out, the officers tasered and then fatally shot him. Mr. Smith's family filed suit under 42 U.S.C. § 1983 and under Georgia law against the county and the police chief, as well as individual officers (collectively, "the officers").[1]

The officers moved for summary judgment, arguing that they are immune from suit. The District Court agreed with the officers as to some of the claims against them, but ruled that the claims related to the shooting must be decided by a

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] The claims against the county and the police chief were dismissed without prejudice and are not up on appeal.

2

jury.  Specifically, the court granted summary judgment to the officers on the Smith family's claims that: (1) the officers illegally entered the Smith home; (2) the officers used excessive force by tasing Mr. Smith; and (3) Sergeant Vincent Gamble was liable as a supervisor for the second tasering and the shooting of Mr. Smith.  The court denied summary judgment on Mrs. Smith's claims that Officers Ings and LePage used excessive force by fatally shooting Mr. Smith, ruling that the shooting claims must be decided by a jury.  Both parties appealed.  After careful consideration and with the benefit of oral argument, we affirm.

## I.

In March 2010, Mr. Smith and his wife, Estelle Smith, went on vacation. They invited a family friend to stay at their home in Lithonia, Georgia, and babysit their two young children, Kasib and Kahrisma.  During the vacation, Mr. and Mrs. Smith had an argument that prompted Mr. Smith to return home early.  However, he forgot his keys.  Mrs. Smith spoke with her husband while he was traveling, and they agreed he should seek counseling.  Mrs. Smith then called the babysitter and instructed him not to let Mr. Smith into the home until Mr. Smith sought counseling.

When Mr. Smith returned home, the babysitter told him what Mrs. Smith had said and did not let him in.  Mr. Smith then walked around to the back of the house, where there was a sliding glass door on the ground floor.  He started

3

banging on the door in an attempt to break it. When the babysitter saw this, he walked out the front door, leaving Mr. Smith's two children alone in the house.

Mr. Smith eventually broke the back door by throwing a large rock through the glass. The babysitter did not see the door shatter, but heard it. Kasib, Mr. Smith's nine-year-old son, witnessed the door breaking. He then saw his father take a kitchen knife upstairs to jimmy open two bedroom doors that had been locked during the vacation.

Meanwhile, the babysitter was standing outside the Smith home. He called Mrs. Smith and told her what was happening, and she instructed him to call the police. The babysitter called the DeKalb County Police Department and told them several things: (1) that Mr. Smith broke into the house; (2) that Mr. Smith was not supposed to be in the house; (3) that the children were still inside; and (4) that the children were alone in the house when Mr. Smith started trying to break in.

Officers Paul Reynolds and Charles Ings arrived about fifteen minutes later. The babysitter was on the phone with Mrs. Smith when the officers arrived, and he handed the phone to Officer Reynolds. Mrs. Smith said her husband was stressed out and needed somebody to talk to. After the phone call, the officers walked around to the broken back door. They did not have a warrant.

The officers entered the Smith home with their guns drawn and announced themselves. Mr. Smith said he was upstairs and asked them to "hold on." When

Officer Reynolds saw Mr. Smith standing at the top of the stairs, Mr. Smith was holding the kitchen knife down beside his body.

The officers ordered Mr. Smith to drop the knife and come downstairs, but he did not. Instead, Mr. Smith said that he did not trust the police, he was in his own home, and he would put the knife down only if they put their guns down. Mr. Smith continued to move back and forth from the top of the stairs to the middle landing, ignoring the officers' commands to drop the knife. This continued for two to three minutes.

Eventually, Officer Ings fired his taser at Mr. Smith. Mr. Smith screamed, fell down, and then ran into his bathroom.[2] Kasib, who was watching from his room at the top of the stairs, testified that his father dropped the kitchen knife when he was tasered. Mrs. Smith in turn testified that Kasib told her a police officer then picked the knife up from where it fell.

After the first tasing, the officers took Kasib and Kahrisma outside to wait with the babysitter. Officers Reynolds and Ings informed dispatch that Mr. Smith was "barricaded" inside his bathroom. While he remained barricaded in the bathroom, more officers arrived on the scene and spoke with Mr. Smith. Specifically, Officers Teryl Clements, Richard LePage, and Phillip Lewis joined

---

[2] The taser barbs may not have completely connected with Mr. Smith's body, because he was wearing heavy clothing at the time. This may explain why the taser did not incapacitate him.

5

Officers Reynolds and Ings outside the bathroom, and they all had their guns or tasers drawn. Officer Clements tried to build rapport with Mr. Smith in order to convince him to come out. Mr. Smith tentatively opened and closed the bathroom door several times. He said he did not trust the police and would come out only if they lowered their weapons. Several of the officers said they saw that Mr. Smith still had the knife.

Sergeant Gamble was the last to arrive before the shooting, and he took over negotiating with Mr. Smith. According to Officer Reynolds, Sgt. Gamble said that he "didn't have all day," the situation "needed to come to a resolution," and Mr. Smith should "think about his kids." Eventually, Officer LePage kicked the bathroom door down. Officer LePage and Sgt. Gamble said they saw Mr. Smith still holding the kitchen knife. Sgt. Gamble ordered that Mr. Smith be tased. Officer Clements fired his taser at Mr. Smith, but again it failed to incapacitate him. Mr. Smith briefly retreated into a closet inside the bathroom.

Finally, Mr. Smith left the bathroom, heading toward the hallway that was the only exit from the area. According to the officers, he charged out with the kitchen knife raised and slashing. Officer Ings shot Mr. Smith once in the chest, and Officer LePage shot him twice in the neck and head. Mr. Smith collapsed and died from his injuries soon after. Sgt. Gamble says he removed the kitchen knife

6

from Mr. Smith's hand.  The record contains a picture of a kitchen knife on the floor near Mr. Smith's body, though it is by his foot, not his hand.

## II.

We review de novo a district court's ruling on summary judgment.  Perez v. Suszczynski, 809 F.3d 1213, 1216 (11th Cir. 2016).  Summary judgment is appropriate only if there is no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  A genuine factual issue is one that "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Id. at 250, 106 S. Ct. at 2511.

To determine whether qualified immunity applies, we conduct a two-step inquiry: (1) do the facts alleged, construed in the light most favorable to the plaintiffs, establish that a constitutional violation occurred; and (2) was the violated constitutional right clearly established.[3]  Perez, 809 F.3d at 1218.  Under either step, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014).  A

---

[3] There is a threshold question of whether the officers were acting in a discretionary capacity.  Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007).  With the exception of the state-law supervisory liability claim against Sgt. Gamble, the plaintiffs do not contest that the officers were acting in a discretionary capacity.

7

right may be clearly established by an existing decision of the Supreme Court, this Court, or the state's highest court. Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015). For a right to be clearly established, "there need not be a case on all fours, with materially identical facts"; rather, there can be "notable factual distinctions" between the precedent and the case before the court. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) (quotations omitted). Officials need only have "reasonable warning" that their conduct violated constitutional rights. Id. (quotation omitted).

## III.

### A.    Jurisdiction

At the outset, we must decide whether to exercise pendent appellate jurisdiction over the plaintiffs' claims in their cross-appeal: (1) that the officers illegally entered the Smith home; (2) that the officers used excessive force by deploying their tasers; and (3) that Sergeant Vincent Gamble was liable as a supervisor for the second tasering and the shooting of Mr. Smith. It is undisputed that this Court has jurisdiction over the officers' appeal from the denial of qualified and official immunity on the shooting claims. See Cummings v. DeKalb Cty., 24 F.3d 1349, 1352 (11th Cir. 1994).

An appeal from the denial of qualified immunity may implicate this Court's discretionary pendent appellate jurisdiction to review otherwise non-appealable

matters.  See Hudson v. Hall, 231 F.3d 1289, 1293–94 (11th Cir. 2000).  Pendent appellate jurisdiction is proper if the non-appealable matters are "inextricably intertwined with an appealable decision or if review of the former decision is necessary to ensure meaningful review of the latter."  Jackson v. Humphrey, 776 F.3d 1232, 1239 (11th Cir. 2015) (quotation omitted) (alteration adopted).  Matters may be sufficiently intertwined where they "implicate[] the same facts and the same law."  Id.  For example, this Court has exercised pendent appellate jurisdiction where a "totality of the circumstances" analysis would have required us to consider the legality of a traffic stop in order to decide the appealable issue of whether the plaintiffs' later consent to search was tainted.  See Hudson, 231 F.3d at 1293–94 & n.4.

We choose to exercise pendent appellate jurisdiction over the plaintiffs' claims in their cross-appeal.  First, like the traffic stop in Hudson, the legality of the officers' entry to the Smith home is intertwined with our resolution of the appealable claims.  In reviewing the totality of the circumstances surrounding the shooting, we consider whether the officers lawfully seized Mr. Smith in the first place.  See id.; see also Zivojinovich v. Barner, 525 F.3d 1059, 1071 (11th Cir. 2008) (per curiam) (noting that, before turning to an excessive force claim, this Court considers whether the officers were entitled to arrest or detain the suspect).  Second, the legality of the officers' use of their tasers is intertwined with the

9

appealable claims, because it involves essentially "the same facts and the same law." Jackson, 776 F.3d at 1239. Finally, Sgt. Gamble's actions as a supervisor are intertwined with the appealable claims because the facts are essentially the same and the plaintiffs claim that Sgt. Gamble was responsible for the second tasing and the shooting. In the interest of judicial economy, we will consider all the claims on appeal. See Hudson, 231 F.3d at 1294.

B.    Illegal Entry Claim

First, the plaintiffs argue that the officers illegally entered the Smith home, and that the District Court erred by entering summary judgment for the officers on this claim. The Fourth Amendment protects against warrantless searches and seizures in the home, which are presumptively unreasonable. See United States v. U.S. Dist. Ct. for E.D. Mich., 407 U.S. 297, 313, 92 S. Ct. 2125, 2134 (1972) ("[P]hysical entry of the home is the chief evil against which the . . . Fourth Amendment is directed."). There are exceptions to this rule, though, including one "well-recognized exception [that] applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." Kentucky v. King, 563 U.S. 452, 460, 131 S. Ct. 1849, 1856 (2011) (quotation omitted) (alteration adopted).

The "exigent circumstances" exception recognizes that police may sometimes need to act without a warrant, as when there is a "danger of flight or

escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002). One of the most clear-cut justifications for entry without a warrant is an emergency involving a "need to protect or preserve life." Id. at 1335; see also id. at 1337 ("[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception."). This can include the lives of people threatened by a suspect, or the suspect's life if he is suicidal. See Roberts v. Spielman, 643 F.3d 899, 905–06 (11th Cir. 2011) (per curiam). An officer must have probable cause to believe that exigent circumstances exist, and the reasonableness of that belief is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." Id. at 905 (quotation omitted).

We conclude that the officers were authorized to enter the Smith home without a warrant under the exigent circumstances exception. In light of the specific circumstances confronting the officers, it was reasonable to believe that an emergency situation existed. The babysitter told the officers that: (1) Mr. Smith broke into the house; (2) Mr. Smith was not supposed to be in the house; (3) the children were still inside; and (4) the children were alone when Mr. Smith started trying to break in. Mrs. Smith also told the officers that Mr. Smith was "stressed

out," "worri[ed]," and not calm.  Before entering the Smith home, the officers observed a shattered glass door and a large rock lying on the floor.  Officers arriving later would have also been aware of radio reports that Mr. Smith was armed with a knife, and refused to drop it.  In these specific circumstances, and having to quickly assess ambiguous information with serious consequences, it was reasonable for the officers to conclude that Mr. Smith or his children were in danger.

The plaintiffs argue that this case is like United States v. Timmann, 741 F.3d 1170 (11th Cir. 2013), in which this Court found exigent circumstances did not exist.  There, a woman called police after she saw what she believed to be bullet holes in her apartment's wall.  Id. at 1173.  The responding officer inspected the holes and talked with the complainant, but the neighbor in the abutting apartment did not appear to be home that day or the next, when the officers returned.  Id. at 1173–74.  Eventually, the officers entered the neighbor's apartment without a warrant and found incriminating evidence.  Id. at 1175.  This Court held that exigent circumstances did not exist because the situation had "none of the[] indicia of an urgent, ongoing emergency."  Id. at 1180.  Specifically, the bullet holes were found almost two days before the officers went into the apartment; there was not a chaotic scene; there was no evidence of violent behavior; there was no reason to think the shooter was emotional; and he did not appear to be home, in any event.

12

Id. at 1180–81.  The same cannot be said here.  Unlike in Timmann, these officers were responding to an ongoing incident; the scene included a shattered door and a babysitter who had seemingly fled outside; the officers had been told that Mr. Smith was emotional; and the officers had been told that Mr. Smith was not supposed to be in the house, yet he was inside with the young children.

The plaintiffs also argue that the officers had a duty to further investigate whether these circumstances were exigent before entering.  However, the plaintiffs do not cite any authority for imposing this heightened duty.  We decline to impose this duty, because it would be contrary to the core purpose of the exigent circumstances exception.  That is, to allow swift police action during an emergency.  See Holloway, 290 F.3d at 1334.  The correct standard is probable cause to believe that exigent circumstances exist, and the standard is met on these facts.  We affirm the District Court's grant of summary judgment to the officers on the plaintiffs' illegal entry claim.

C.    Excessive Force Claims

There are several claims on appeal related to the officers' use of force against Mr. Smith.  First, the plaintiffs argue that the officers violated federal and state law by deploying their tasers on two separate occasions.  Second, the plaintiffs claim that the officers violated federal and state law by fatally shooting Mr. Smith.  The District Court granted summary judgment to the officers on the

13

tasering claims but denied summary judgment on the shooting claims. We affirm that decision.

To determine whether the force used to effect a seizure[4] was objectively reasonable, we carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871 (1989) (quotation omitted). Although some amount of force is generally needed to subdue a suspect, the amount used must be reasonably proportionate to the need for force. Lee v. Ferraro, 284 F.3d 1188, 1197–98 (11th Cir. 2002). Courts consider several factors in judging the weight of the government's interests, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," and the inquiry "is an objective one." Id. at 396–97, 109 S. Ct. at 1872.

*1.    Tasering*

The plaintiffs argue that the officers violated federal and state law by deploying their tasers, and that the District Court erred by granting summary

---

[4] The officers do not dispute that these uses of force constituted seizures.

14

judgment on these claims.  This Court has held that "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force."  Zivojinovich, 525 F.3d at 1073 (citing Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)).  This is because, "where a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer."  Fils v. City of Aventura, 647 F.3d 1272, 1290 (11th Cir. 2011) (quotations omitted) (alteration adopted).  On the other hand, unprovoked taser use "against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment."  Id. at 1289.  For example, this Court has held that taser use crossed the line and became excessive where the officer tasered a resisting suspect not once—which the plaintiff conceded would have been justified—but up to a dozen times over two minutes.  See Oliver v. Fiorino, 586 F.3d 898, 905–07 (11th Cir. 2009).

Leading up to the first tasing, Mr. Smith was armed with a knife.  He repeatedly disobeyed the officers' commands to drop the weapon and moved toward the officers while holding the weapon.  On this record, the officers had probable cause to arrest Mr. Smith under Georgia law for simple assault or obstruction of officers.  See O.C.G.A. § 16-5-20(a) (defining misdemeanor simple assault as "[c]ommit[ing] an act which places another in reasonable apprehension

15

of immediately receiving a violent injury"); id. § 16-10-24(a) (defining misdemeanor obstruction of officers as "knowingly and willfully obstruct[ing] or hinder[ing] any law enforcement officer in the lawful discharge of his official duties"). The officers tried to get Mr. Smith to cooperate for two to three minutes before deploying the taser. Although the crimes Mr. Smith was suspected of were mere misdemeanors, a reasonable officer on the scene could have believed that Mr. Smith posed a danger to himself or others and was actively resisting arrest. In these circumstances, our precedent dictates that the officers' single taser discharge on Mr. Smith during the first tasering was reasonable.

Leading up to the second tasering, Mr. Smith was barricaded in his bathroom and repeatedly disobeyed the officers' commands to come out. When he eventually did start coming out of the bathroom, he moved toward the exit rather than immediately surrendering. There is a material dispute over whether Mr. Smith was armed at the time. Viewing the evidence and all factual inferences in the light most favorable to the plaintiffs, we must assume for purposes of summary judgment that Mr. Smith no longer had the knife at the time. Even so, our precedent does not necessarily require that a noncompliant suspect be armed to justify the use of a nonlethal taser. See, e.g., Zivojinovich, 525 F.3d at 1073 (holding that it was permissible to tase a handcuffed arrestee because he belligerently sprayed blood at an officer when he spoke); Draper, 369 F.3d at 1278

16

(holding that it was permissible to tase an unarmed truck driver because he was belligerent and noncompliant during a traffic stop).  In this tense situation, we cannot say that the officers' single use of a taser on Mr. Smith was unreasonable.[5]

## 2.    *Shooting*

The officers argue that they are entitled to qualified immunity on the claims related to the fatal shooting of Mr. Smith, and that the District Court erred by denying summary judgment on these claims.  Deadly force is, of course, the most severe deprivation, and the government must have significant interests to justify it.  The Supreme Court has said, "It is not better that all [] suspects die than that they escape.  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force."  Tennessee v. Garner, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701 (1985).  Our Constitution only permits an officer to use deadly force if he:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[,] or that he has committed a serious crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009) (quotation omitted).

Because there is a genuine dispute of fact over whether Mr. Smith was armed and

---

[5] For the same reasons, the officers did not violate Georgia law by deploying their tasers. See City of East Point v. Smith, 365 S.E.2d 432, 434 (Ga. 1988) (using the same test of objective reasonableness applied in Fourth Amendment cases for a search and seizure claim brought under the Georgia Constitution).

dangerous when he was killed, we affirm the District Court's denial of summary judgment on these claims.

As is often true in qualified immunity cases, there are different accounts of what happened here. The plaintiffs say that Mr. Smith dropped the kitchen knife on the staircase when he was tased the first time and did not pick it back up. We must therefore infer that he did not have a knife while barricaded in the bathroom. The officers say, to the contrary, that Mr. Smith was visibly armed with the kitchen knife while barricaded in the bathroom, and came out of the bathroom violently slashing with it. There is material evidence in the record supporting both accounts. On the plaintiffs' side, there is the testimony of Kasib, who witnessed his father dropping the kitchen knife;[6] the dispatch log, which twice states that Mr. Smith had a knife before he was tasered on the stairs, but never says he still had it afterward; and a portion of an Internal Affairs report that describes the crime scene in detail but says nothing about a knife. On the officers' side, there are the

---

[6] According to Mrs. Smith, Kasib also told her that he saw one of the officers pick up the knife. As the District Court noted, this is hearsay. The general rule is that hearsay cannot be considered at the summary judgment stage, but there is an exception "if the statement could be reduced to admissible evidence," for example by "hav[ing] the hearsay declarant testify directly to the matter at trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (quotation omitted). Because Kasib could testify to these facts at trial, the District Court did not err in considering this statement. We reject the officers' argument that this statement should have been excluded because it contradicts Kasib's deposition testimony. See id. at 1294. Kasib was never asked what happened to the knife after his father dropped it, and he never offered a contradictory statement during the deposition.

officers' accounts as well as a crime scene photo that shows a kitchen knife lying near Mr. Smith's body, at his feet.

It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment.  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.  Instead, where there are "varying accounts of what happened," the proper standard requires us to adopt the account most favorable to the non-movants.  Perez, 809 F.3d at 1217.  Applying that standard here, we accept for purposes of summary judgment that Mr. Smith was unarmed when he was barricaded inside the bathroom and when he exited.[7]  It is reasonable to infer from the plaintiffs' evidence that Mr. Smith remained unarmed because he did not get a second kitchen knife either in the few steps between his upstairs landing and his bathroom, or inside the bathroom itself.  The officers' argument to the contrary is purely speculative, and thus does not refute this inference.[8]

With the facts properly framed, we turn to whether these facts can support a clearly established constitutional violation.  First, the use of deadly force in this

---

[7] We accept this version of events bearing in mind that "what are considered the 'facts' [on summary judgment] may not turn out to be the 'actual' facts if the case goes to trial."  Perez, 809 F.3d at 1217.

[8] This case is not like Wood v. City of Lakeland, 203 F.3d 1288 (11th Cir. 2000), as the officers contend.  In Wood, this Court rejected a magistrate judge's subjective interpretation of an autopsy report in favor of the officers' testimony because the officers were "the only persons who were . . . in position to see or hear what happened [during a fatal shooting]."  Id. at 1290–91.  Wood is distinguishable because the autopsy report was ambiguous and the magistrate relied on his own subjective interpretation to guess at the suspect's movements during the encounter.  Id.  Here, Kasib was in a position to see and hear his father dropping the kitchen knife before running into the bathroom, and his unambiguous eyewitness testimony is supported by other evidence in the record.

19

circumstance was a constitutional violation.  The officers did not have probable

cause to believe Mr. Smith posed a threat of serious physical harm when he left his

bathroom without a weapon and moved toward the only exit.  To the contrary, Mr.

Smith had never made physical contact with the officers or explicitly threatened

them; he asked them to put down their weapons and told them he was afraid; and

he appeared to be trying to get out of the area after hiding in his bathroom and

closet.  The officers had no reason to believe that deadly force was necessary to

prevent Mr. Smith's escape, given that he had merely committed misdemeanor

offenses and was completely surrounded.  And despite having time to do so while

Mr. Smith was barricaded in the bathroom, the officers did not warn him that they

might use deadly force.  The government's interest was not sufficiently weighty to

justify the use of deadly force on these facts.  See McCullough, 559 F.3d at 1206.

We have found it unreasonable for police to shoot an unarmed suspect, even when

the suspect has physically struggled with officers.  See, e.g., Salvato v. Miley, 790

F.3d 1286, 1293–94 (11th Cir. 2015) (holding that it was unreasonable for an

officer to shoot an unarmed suspect after he fought with police but then backed out

of striking distance); Gilmere v. City of Atlanta, 774 F.2d 1495, 1496–97, 1502

(11th Cir. 1985) (en banc) (holding that it was unreasonable for an officer to shoot

a drunken suspect as he ineffectually fought with police), abrogated on other

grounds by Graham, 490 U.S. 386, 109 S. Ct. 1865.  And the Supreme Court has

ruled it unreasonable to shoot an unarmed person who is escaping, even when the person has committed a felony.  See Garner, 471 U.S. at 11, 105 S. Ct. at 1701.

Second, the violated right was clearly established at the time of the shooting. There are three ways to show that a right was clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."  Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted). Garner clearly established that Mr. Smith had a right to be free from deadly force when he was not threatening the officers, was merely suspected of misdemeanor offenses, and was attempting to escape.  See Garner, 471 U.S. at 11, 105 S. Ct. at 1701; see also Salvato, 790 F.3d at 1294 (concluding that Garner clearly established the right of an unarmed, retreating suspect to be free from deadly force); Morton v. Kirkwood, 707 F.3d 1276, 1282–83 (11th Cir. 2013) (same); Lundgren v. McDaniel, 814 F.2d 600, 603 (11th Cir. 1987) (noting that this right was not clearly established until Garner).  The officers had "reasonable warning" that fatally shooting an unarmed person suspected of a misdemeanor in his own home merely because he was moving toward them was a constitutional violation. Holloman, 370 F.3d at 1277 (quotation omitted).  Thus, we affirm the District

21

Court's denial of summary judgment on the plaintiffs' § 1983 claim against Officers Ings and LePage for shooting Mr. Smith.

We also affirm the District Court's denial of summary judgment on the plaintiffs' parallel state-law claim. Georgia has an analogue to qualified immunity called "official immunity." See Jordan v. Mosley, 487 F.3d 1350, 1357 (11th Cir. 2007). To overcome official immunity, the plaintiff must show that the officer had "actual malice or an intent to injure." Cameron v. Lang, 549 S.E.2d 341, 345 (Ga. 2001). In a police shooting case, this analysis often comes down to whether the officer acted in self-defense: "[I]f [officers] shot [the suspect] intentionally and without justification, then they acted solely with the tortious actual intent to cause injury. On the other hand, if [officers] shot [the suspect] in self-defense, then they had no actual tortious intent to harm him." Kidd v. Coates, 518 S.E.2d 124, 125 (Ga. 1999) (quotation and citation omitted).

The same dispute of facts that prevents summary judgment on the plaintiffs' § 1983 claim related to the shooting also prevents summary judgment on their parallel state-law claim. That is, there remains a question about whether Mr. Smith was armed and dangerous when he was killed. According to Georgia law, this disputed question is dispositive of the claim. See id. If Mr. Smith was armed and dangerous, then the officers legitimately acted in self-defense by shooting him. If, on the other hand, Mr. Smith was merely leaving the bathroom with no weapon,

22

then the officers acted with actual tortious intent to injure.  See id.  It is a jury's place to resolve this dispute of fact.  See Anderson, 477 U.S. at 249–50, 106 S. Ct. at 2511.

D.    Supervisory Liability Claims

The plaintiffs argue that Sgt. Gamble was liable as a supervisor under federal and state law for the second tasing and the fatal shooting of Mr. Smith, and that the District Court erred by granting summary judgment on these claims. "Supervisory liability under section 1983 may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation." Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988) (per curiam). Personal participation occurs when, for example, the supervisor inflicts the injury himself.  See Hewett v. Jarrard, 786 F.2d 1080, 1087 (11th Cir. 1986).  A causal connection can be established "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Mercado v. City of Orlando, 407 F.3d 1152, 1158 (11th Cir. 2005) (quotation omitted).  This standard is quite rigorous. Id.  In light of this demanding standard, we must affirm the District Court's grant of summary judgment to the officers on these claims.

23

First, no supervisory liability can arise from the second tasing of Mr. Smith because we have concluded it was not a constitutional violation. See Lewis, 855 F.2d at 738. Second, the plaintiffs' § 1983 supervisory liability claim related to the shooting fails because Sgt. Gamble neither participated in the shooting nor had a legally sufficient causal connection to it. The District Court properly rejected the plaintiffs' argument, based on the out-of-circuit case of Billington v. Smith, 292 F.3d 1177 (9th Cir. 2002), that Sgt. Gamble personally participated by escalating the situation. Under this Circuit's law, Sgt. Gamble did not personally participate because he did not shoot at Mr. Smith or order any of the officers to do so, and his mere presence at the scene was not enough. See Mercado, 407 F.3d at 1158. Whether Sgt. Gamble's actions were causally connected to the shooting, however, is a closer call.

As the District Court noted, Sgt. Gamble may have made "a tragic mistake of judgment" by not calling in the Special Weapons and Tactics ("SWAT") team. The DeKalb County Police Department Manual states that the SWAT team handles "barricaded suspects," in order to "contain the situation and attempt to negotiate a peaceful end to the situation." Once Mr. Smith closed himself in his bathroom and refused to come out, there may have been a so-called barricade situation. See Doc. 116-8 at 4 (defining a "barricade situation" as "[t]he standoff created by an armed or potentially armed suspect in any location, whether fortified or not, who is

refusing to comply with police demands for surrender"); see also Doc. 123 at 74–76 (one of Sgt. Gamble's subordinates stating that he thought it was a barricade situation); Doc. 74-1: 26 (police dispatch log indicating that Mr. Smith was barricaded in the bathroom).  Nevertheless, Sgt. Gamble's possible mistake of judgment does not rise to the level of creating a causal connection between his acts and the shooting, because there are no facts suggesting that he either directed the officers to act unlawfully or knew they would.  See Mercado, 407 F.3d at 1158.

Finally, the plaintiffs' state-law supervisory liability claims related to the shooting fail because Sgt. Gamble did not violate a ministerial duty or act with actual malice.  Under Georgia law, official immunity is defeated if the officer negligently performed a ministerial act.  Grammens v. Dollar, 697 S.E.2d 775, 777 (Ga. 2010).  "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.  A discretionary act, however, calls for the exercise of personal deliberation and judgment."  Id. (quotation omitted).  Choosing whether to call in the SWAT team was not a ministerial act because Sgt. Gamble had to exercise his personal judgment in order to assess the evolving situation and then decide whether it warranted SWAT intervention.  See Hill v. Jackson, 783 S.E.2d 719, 725 (Ga. Ct. App. 2016).  Neither have the plaintiffs shown that Sgt. Gamble had actual malice.  There are no facts suggesting that Sgt.

25

Gamble had a "deliberate intention" to cause the fatal shooting of Mr. Smith. Merrow v. Hawkins, 467 S.E.2d 336, 337 (Ga. 1996).   We must therefore affirm the District Court's grant of summary judgment on the plaintiffs' supervisory liability claims.

*       *       *

The plaintiffs challenged most of the officers' actions on the day of this tragedy.  Many of those actions were reasonable under these tragic circumstances. But we cannot say, as a matter of law, that Officers Ings and LePage acted appropriately when they shot and killed Mr. Smith.  It is for a jury to decide whether their actions were justified.  We therefore AFFIRM the District Court's well-considered order partially granting and partially denying summary judgment to the officers in this case.

**AFFIRMED.**

26