[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-12857

————————————————

D.C. Docket No. 1:17-cv-20323-CMA


EDELINE JULMISSE PROSPER,
as Personal Representative of the Estate
of Junior Prosper,

                                                    Plaintiff – Appellant,

versus

ANTHONY MARTIN,
Miami-Dade Police Officer, Badge 7819, individually,

                                                    Defendant – Appellee.


————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(March 5, 2021)

Before WILLIAM PRYOR, Chief Judge, TJOFLAT, and HULL, Circuit Judges.

TJOFLAT, Circuit Judge:

This case arises from an encounter between a taxicab driver named Junior Prosper and a Miami-Dade police officer named Anthony Martin that resulted in Prosper's death. Prosper's widow Edeline sued Martin under 42 U.S.C. § 1983 in the United States District Court for the Southern District of Florida. The District Court found that Martin was entitled to qualified immunity and granted his motion for summary judgment.

Ordinarily, we would be required to decide a case of this posture on the plaintiff's version of the facts. In this case, however, Plaintiff's account is based on a blurry surveillance video that depicts little more than two persons engaged in a two-minute-long struggle in the dark beside a busy highway. We must therefore take the facts as told by the only living eyewitness of those critical two minutes—Defendant Martin. On those facts, we affirm the District Court's decision to grant summary judgment.

I.

A.

In the early morning hours of September 28, 2015, Prosper was driving his taxi on NW 119th Street in Miami when he apparently lost consciousness, allowing his taxi to slowly drift off the road and collide with a pole near the I-95 on-ramp. Minutes later, a bus driver named William Devy noticed Prosper's taxi and pulled

2

over to assist.  He approached the taxi on foot and peered through the window.

Seeing Prosper slumped over in the driver seat and breathing heavily, Devy tapped

on the glass.  Prosper did not respond, so Devy tapped louder.  Prosper's arm

jerked, and Devy retreated to call 911.

He told the dispatcher that a taxi had run into a pole and its driver looked

like "he's passing out."  After a few minutes, Prosper exited the taxi and, as Devy

told the dispatcher, began "running" up the on-ramp toward I-95.  A tow truck

operator named Raul Sandoval pulled over to ask Devy what was happening.  Still

on the 911 call, Devy pointed to Prosper and told Sandoval he thought Prosper was

drunk and had stolen the taxi.

Officer Martin then arrived on the scene in response to a dispatch call that a

taxi had run into a pole.  Devy and Sandoval pointed Prosper out to Martin, told

him Prosper was running up I-95, that he was "on something" and "acting weird,"

and that the taxi was "probably stolen."  Martin then approached Prosper in his

police cruiser on the I-95 on-ramp, activated his emergency lights, and commanded

Prosper through the cruiser speaker to "stop walking."  Prosper did not obey

Martin's commands, but continued walking up the ramp.  Prosper's gait struck

Martin as abnormal—in Martin's words, Prosper was "stumbling" and "looked like

3

a zombie almost."[1]  Observing that Prosper was coming dangerously close to traffic, Martin exited his cruiser and approached Prosper on foot.

The parties disagree about what happened next, but three things are undisputed: (1) Martin tased Prosper, (2) Prosper bit down on Martin's left index finger, and (3) Martin shot Prosper three times in the chest.  The parties dispute the manner and order in which these events unfolded.  Plaintiff's version of events is based largely on a blurry surveillance video from a nearby business, Biscayne Air Conditioning, Inc. (the "Biscayne Air Video").  Martin's version is based on his own statement to police and his deposition testimony.[2]  We will present Martin's version first, and then Plaintiff's.

According to Martin, Prosper punched him in the face after he tried to direct Prosper away from highway traffic.  Martin struck back, took out his taser, and began commanding Prosper to "get down" and "get on the ground" so that he could make an arrest.  Prosper started advancing toward Martin, and Martin discharged his taser, causing Prosper to fall down an embankment beside I-95.

---

[1] Although not relevant to what a reasonable officer in Martin's position would have surmised about Prosper's behavior, *see infra* Part III.A, there is evidence in the record suggesting that Prosper was not, in fact, intoxicated on the night of his death.  Evidence instead suggests that Prosper's behavior may have been caused by a brain infection.

[2] Devy left the scene to go to work shortly after Martin arrived, and although Sandoval was still present, he stated it was too dark for him to see most of the struggle.  Thus, aside from the little that Sandoval observed, Martin is the only living eyewitness to the events.

Prosper crawled away from Martin through some bushes and Martin pursued.  Prosper then emerged from the brush and began running toward a nearby fence.  While running, Prosper tripped and fell, allowing Martin to catch up to him.  Martin ordered Prosper to "turn over" and "place his hands behind his back."  When Prosper did not obey, Martin drive stunned him with his taser.[3]  Prosper then lunged at Martin, bit down on Martin's left index finger, and dragged Martin down on top of him.

Martin dropped his taser and immediately began trying to pry Prosper's jaws open with his free hand while begging Prosper to release his finger.  When that failed, he reached for his firearm and shot Prosper once in the chest.  Prosper continued biting Martin's finger while "twisting and turning" his head from side to side.  Martin shot Prosper a second time, and when Prosper still did not release his finger, he fired a third shot, killing Prosper.

Now Plaintiff's version.  Plaintiff denies that Prosper ever struck Martin.  According to Plaintiff, after Martin approached Prosper to direct him away from traffic, the two lost their balance and fell down the embankment.  Martin promptly got to his feet, gained distance from Prosper, and tased him three times as he laid in the bushes.  Prosper then crawled through the bushes in retreat, and Martin

---

[3] A taser can be used in either prong mode or drive stun mode.  A taser used in drive stun mode is less powerful and must be used at point blank range.  Martin could not use his taser in prong mode because its cartridges had been depleted by the first tasing.

pursued.  Martin caught up to Prosper and either drive stunned him or shot him once with his firearm.  As Prosper continued to flee, Martin tackled him to the ground and began beating him with his fists.  His finger then became "lodged" in Martin's mouth,[4] and he shot Prosper two or three times in the chest without first pleading with Prosper to release his finger.[5]

## B.

Edeline Prosper, acting as personal representative of the estate of Junior Prosper, sued Martin in his individual capacity in the United States District Court for the Southern District of Florida on January 25, 2017.  The District Court stayed the case on March 10, 2017 pending the completion of state investigations into the incident.  Once the investigations were completed, the case was re-opened, and Plaintiff filed her First Amended Complaint on September 28, 2017.

On April 17, 2018, the District Court dismissed Plaintiff's First Amended Complaint without prejudice on the ground that it was a shotgun pleading and failed to state a claim upon which relief could be granted.  Plaintiff then filed her Second Amended Complaint, which the Court again dismissed on the ground that it failed to identify how Plaintiff had any basis of knowledge for the facts alleged.

---

[4] Plaintiff does not deny that Prosper bit Martin's finger, but insists that a reasonable jury could find that Prosper did not "bite down hard" until after Martin shot him.

[5] Plaintiff agrees that Martin only fired a total of three shots but is noncommittal on whether the first shot was fired before or after Prosper's finger became "lodged" in Martin's mouth.

On July 2, 2018, Plaintiff filed her Third Amended Complaint, the operative complaint in the case.  The complaint contained a single count under 42 U.S.C. § 1983 alleging that Martin used excessive force by tasing and shooting Prosper in violation of the Fourth Amendment.  Unlike her second complaint, Plaintiff's third complaint identified the Biscayne Air Video as the basis of her knowledge.

On July 23, 2018, Martin moved to dismiss Plaintiff's Third Amended Complaint on the grounds that it failed to state a claim and that Martin was entitled to qualified immunity.  The Court denied Martin's motion and the parties proceeded to discovery.

On March 25, 2019, Martin moved to exclude two of Plaintiff's expert witnesses under *Daubert*.[6]  Specifically, Martin challenged the opinions of Dr. Michael Knox (an expert in "crime scene reconstruction") and Dr. Bruce Kohrman (a neurologist).  Knox offered nine opinions relating to the circumstances of the altercation between Martin and Prosper, the location of the Biscayne Air surveillance camera, and what the Biscayne Air Video shows.  Kohrman offered a single opinion regarding the cause of Prosper's unusual behavior on the night of his death.  In his opinion, Prosper had likely suffered a stroke, seizure, or brain infection.

---

[6] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

The District Court granted Martin's *Daubert* motion in part. The Court agreed that Knox's opinions interpreting the Biscayne Air Video would not be helpful to a jury since Knox himself admitted that he does not "purport to have some expertise to see anything in the video that somebody else can't see." The Court also found that Knox's opinion that "Officer Martin could have fired a minimum of three rounds from his service weapon and a maximum of four rounds" was unhelpful because it was undisputed that Martin fired at least three shots, and whether he fired a fourth was a matter the jury could determine without Knox's help. Knox's remaining opinions—concerning measurements he had taken of the landscape where the altercation occurred and the position of the Biscayne Air surveillance camera—would be helpful to a jury. As for Kohrman's opinion regarding the cause of Prosper's behavior, the Court said it was both unreliable and unhelpful. It was unreliable because Korhman concluded merely that Prosper *may have* suffered from *one of three* separate neurologic events. It was unhelpful because the cause of Prosper's unusual behavior was irrelevant to whether Martin's use of force was objectively reasonable, since that cause was unknown to Martin at the time.

Martin moved for summary judgment on the same day he filed his *Daubert* motion. He argued he did not violate Prosper's Fourth Amendment rights because his use of force was objectively reasonable under the circumstances. In the

8

alternative, Martin argued he was entitled to qualified immunity because, to the extent he violated Prosper's constitutional rights, those rights were not "clearly established." The District Court agreed with Martin on both points and granted his motion for summary judgment on July 1, 2019.

On appeal, Plaintiff argues that the District Court abused its discretion in excluding the opinions of Knox and Kohrman and erred in entering summary judgment for Martin. We reject Plaintiff's arguments and affirm the District Court.

## II.

We review a district court's exclusion of expert testimony for abuse of discretion. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43, 118 S. Ct. 512, 517 (1997)). Unless the district court's decision is "manifestly erroneous," we must defer to it. *Id.* (citation omitted).

We review a grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party and resolving reasonable inherences in her favor. *Al-Rayes v. Willingham*, 914 F.3d 1302, 1306 (11th Cir. 2019). Summary judgment is only proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

III.

We first address Plaintiff's argument regarding the District Court's decision to exclude her experts' opinions under *Daubert*.  We then address her argument that the District Court erred in finding Martin entitled to qualified immunity.

A.

Expert testimony is admissible under Federal Rule of Evidence 702[7] if: "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue."  *Chapman,* 766 F.3d at 1304 (quotation marks omitted).  "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

---

[7] These three prongs are a judicial gloss on Rule 702, which says:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, identified four non-exhaustive factors that will commonly bear on the second inquiry—i.e., the reliability inquiry:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (per curiam) (citing *Daubert*, 509 U.S. at 593–94, 113 S. Ct. at 2796–97). These factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, 113 S. Ct. at 2796, and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999). The ultimate objective of the inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* The judge "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316–17 (11th Cir. 1999) (quotation marks omitted). Importantly, the reliability

11

inquiry is limited to "principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594–95, 113 S. Ct. at 2797.

The third inquiry—whether the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue—is commonly called the "helpfulness" inquiry. *See Frazier*, 387 F.3d at 1260. The touchstone of this inquiry is the concept of relevance. *See Daubert*, 509 U.S. at 591, 113 S. Ct. at 2795 (noting that the helpfulness inquiry "goes primarily to relevance"). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18). Even if the expert's testimony is relevant, it "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63. Thus, to be helpful, the testimony must "concern[] matters that are beyond the understanding of the average lay person." *Id.* at 1262.

Plaintiff argues the District Court abused its discretion in excluding the expert opinions of Knox and Kohrman. To prevail, Plaintiff must convince us that the Court made a clear error of judgment when it determined that Knox's opinions were unhelpful and Kohrman's were both unhelpful and unreliable.[8] *See Frazier*, 387 F.3d at 1259 ("[W]hen employing an abuse-of-discretion standard, we must

---

[8] That both experts are qualified is undisputed.

12

affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard.").  We are not convinced.

We agree with the District Court that Knox's interpretation of the Biscayne Air Video was not helpful because it did not offer anything the jury could not discern on its own.  Knox asserted that the "physical and video evidence" did not indicate that Prosper (1) punched Martin during their initial encounter, (2) was standing when Martin first tased him, or that (3) he was biting Martin's finger at the time he was shot.  The basic observation underlying these three opinions was that the video did not "really [show] much of anything."  In Knox's words, "It's blobs, basically."  "[A]nyone else watching the video," Knox admitted, "is going to see the same thing."  As the District Court noted, the jury did not need Knox to tell them what they could plainly see for themselves.

Plaintiff argues that Knox would do more than "merely look at the video and tell the jury what he saw."  His opinions, she says, are based on "decades of law enforcement experience in reviewing all the evidence, not just the video, conducting such advanced analyses as laser scanning, analyzing terrain and visual perspective, and creating computer models."  Even so, the fact remains that Knox's experience and knowledge in this instance is simply not helpful.  The jury can

observe that the video depicts little more than "gross movements" without Knox's aid.[9]

We also agree with the District Court that Kohrman's opinion regarding the cause of Prosper's erratic behavior on the night of his death would not be helpful to a jury. In Kohrman's opinion, Prosper's behavior was not due to drugs or alcohol, but rather "stroke, seizure, or [brain] infection" were the "most likely causes." Plaintiff argues that Kohrman's opinion would be helpful to (1) rebut Martin's contention that Prosper was drugged or intoxicated at the time of the incident and (2) show that Prosper "suffered some kind of neurological episode." We disagree.

The District Court correctly observed that "[t]he qualified immunity analysis . . . is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (quoting *White v. Pauly*, 580 U.S. —, —, 137 S. Ct. 548, 550 (2017) (per curiam) (quotation marks omitted)). Thus, whether Prosper was drugged, intoxicated, or had suffered a neurological episode was not relevant. What

---

[9] Although the District Court excluded a fourth opinion offered by Knox regarding the capacity of Martin's firearm, Plaintiff makes no mention of it in her brief and has therefore abandoned the point. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("A party fails to adequately brief a claim when he does not plainly and prominently raise it." (quotation marks omitted)).

14

mattered was what Martin could have known on that night and whether he acted as an objectively reasonable officer under the circumstances.[10]

We conclude the District Court was within its discretion to exclude the opinions of both experts.

B.

Qualified immunity protects government officials from money damages unless a plaintiff shows (1) that the facts alleged, construed in the light most favorable to her, establish that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080 (2011); *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018).

The constitutional right at issue here comes from the Fourth Amendment's prohibition against unreasonable seizures of the person—specifically, the freedom from excessive uses of force. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S. Ct. 1865, 1870–71 (1989). As with Fourth Amendment claims generally, the touchstone of excessive force claims is "reasonableness." *See id.* at 395, 109 S. Ct. at 1871. Determining whether an officer's use of force is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's

---

[10] Because we find that Kohrman's opinion was unhelpful, we need not decide whether the District Court abused its discretion in concluding that it was also unreliable.

15

Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S. Ct. at 1871 (quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S. Ct. at 1872.

Importantly, we must judge the officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S. Ct. at 1872. The question, ultimately, is whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396–97, 109 S. Ct. at 1872. When the use of deadly force is at issue, we ask whether "the officer had probable cause to believe that the suspect posed a threat of 'serious physical harm' to the officer or others, and whether the officer had given the suspect a warning about the use of deadly force, if doing so was feasible." *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1229 (11th Cir. 2020).

In determining whether the constitutional right at issue was "clearly established" at the time the officer acted, we ask whether the contours of the right

16

were sufficiently clear that every reasonable officer would have understood that what he was doing violates that right. *al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083. A plaintiff may show that a right was "clearly established" through: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)). If a plaintiff relies on case law, the decisions must come from the United States Supreme Court, the Eleventh Circuit, or the highest court of the pertinent state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). However it is shown, "clearly established law" must be "particularized" to the facts of the case, *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987), and must not be defined "at a high level of generality," *al-Kidd*, 563 U.S. at 742, 131 S. Ct. at 2084.

We agree with the District Court that Martin acted as an objectively reasonable officer both in tasing and in using deadly force on Prosper. But before we explain why, we must determine the contours of the particular right alleged to have been violated, taking the facts in the light most favorable to Plaintiff.

17

Plaintiff argues there are issues of fact regarding whether Prosper (1) punched Martin during their initial encounter, (2) was standing when Martin first tased him, and (3) was biting Martin's finger at the time he was shot. Martin's deposition testimony answers all three questions in the affirmative, thus constructing a situation where Prosper committed a violent felony (battery of a law enforcement officer),[11] posed an "immediate threat" to Martin, and was resisting arrest. *See Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. The Biscayne Air Video—or more precisely, Plaintiff's interpretation of it—gives a different impression.[12]

Rather than showing punches thrown by Prosper, Plaintiff claims the Biscayne Air Video shows merely that the two "los[t] their balance and f[e]ll

---

[11] In addition to battery of a law enforcement officer in violation of Florida Statutes § 784.07(2)(b), Martin alleges that Prosper violated: § 316.061(1) (leaving the scene of an accident); § 316.130(18) (walking on a limited access facility or a ramp connecting a limited access facility to any other street or highway); § 316.072(3) (failure to obey commands of police officials); § 843.02 (resisting an officer without violence to his person); § 843.01 (resisting an officer with violence to his person); and § 784.045(1)(a)(1) (aggravated battery).

[12] In addition to the video, Plaintiff relies on a few other materials in the record to create an issue of fact as to whether Prosper punched Martin. We assume for the sake of discussion that these materials are admissible, but we are unconvinced that they create a fact issue. According to Plaintiff, police reports of the incident show that "Martin did not immediately report any punches." On the contrary, the reports reflect that Prosper assaulted Martin not just by biting him but also by striking him with his "Hands/Arms." A report prepared by an officer arriving on the scene after Prosper was shot describes the altercation in vague terms—"they got into a struggle"—but such vagueness is perfectly consistent with Martin's testimony that Prosper struck him. Another officer who had arrived on the scene testified that Martin did not tell her that Prosper had punched him, but that she knew "they got into an altercation." This, too, is consistent with Martin's testimony and therefore fails to create an issue of fact.

18

together into some nearby bushes." It also shows, according to Plaintiff, that Martin proceeded to "tase[] [Prosper] as he lay on the ground in the bushes." Finally, Plaintiff argues it shows Martin chased Prosper down as he attempted to "crawl[] away from Martin through the bushes," stood over him "in a shooting position," and then either tased Prosper again or shot him with his firearm. If Plaintiff is correct about what the Biscayne Air Video shows, then the question before us is whether Martin violated Prosper's Fourth Amendment rights by tasing and shooting him without provocation while he slowly retreated, and all before he ever bit Martin's finger. We believe Plaintiff makes too much of the video.

Where there are "varying accounts of what happened" on summary judgment, we are required to adopt the account most favorable to the nonmoving party. *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) (quoting *Perez*, 809 F.3d at 1217). This principle, though, is subject to the caveat that the nonmoving party's version of events must be sufficiently supported by the record that a reasonable jury could find it to be true. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by *citing to particular parts of materials in the record . . . .*"); *Chapman*, 229 F.3d at 1023 ("A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."). We will not treat as true a party's unfounded speculation about what

happened.  *See Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985); *Smith*, 834 F.3d at 1296.

Plaintiff's interpretation of the Biscayne Air Video amounts to mere speculation, and the video therefore fails to create the issues of fact that Plaintiff says it does.  Plaintiff herself described the video as "far from a model of clarity," and the expert witness she retained to interpret it said "[you] can barely make out their bodies. . . . You can't make out really much of anything other than some very gross movements."  A blurry video that does not depict much of anything cannot give rise to issues of fact about what did or did not happen on a particular occasion.  As the District Court noted, the video "does not *contradict* [Martin]'s statements; at best, it fails to *corroborate* them."  Martin's version of events thus remains unrebutted and controls our analysis.

Accordingly, the question before us is whether Martin violated Prosper's Fourth Amendment rights by using deadly force after Prosper struck him in the face, resisted arrest through three taser discharges, and bit down on his finger while "twisting and turning" with unabating intensity.  Since Plaintiff also challenges Martin's use of the taser as excessive, we must decide whether that violated Prosper's Fourth Amendment rights, as well.  We are convinced the District Court committed no error in finding that Martin acted as an objectively reasonable officer in both respects.

The critical inquiry on the deadly force claim is whether an officer in Martin's position reasonably could have believed that Prosper posed a serious threat of physical harm at the time Prosper had Martin's finger in his mouth. *See Shaw*, 884 F.3d at 1099; *Cantu*, 974 F.3d at 1230. In making this assessment, we must consider the "totality of the circumstances," including the events leading up to the point at which deadly force was used and the impressions a reasonable officer would have gleaned from them. *See Shaw*, 884 F.3d at 1099.

From the moment he arrived on the scene, a reasonable officer would have observed—as Martin did—that Prosper was behaving irrationally and erratically. As Martin put it, Prosper was "stumbling . . . [like] something was wrong with him" and had an "out-of-it look on his face." He was also coming dangerously close to the expressway, where traffic was zooming by at 60 or 70 miles per hour.

Once Martin attempted to engage Prosper, it would have also become clear to a reasonable officer that Prosper was unresponsive and non-compliant. Martin approached Prosper in his cruiser and turned on his flashing lights "[t]o let him know that . . . I was the police, so . . . he would turn around." But Prosper did not turn around; he only continued stumbling toward traffic. Martin then shined his spotlight on Prosper and began commanding him over the cruiser speaker to "stop, stop walking." Prosper merely "turned around and looked," but kept walking.

21

It goes without saying that once Prosper struck Martin, a reasonable officer would know that he was dealing with a man who was not only irrational, erratic, and unresponsive, but also violent.  After the two exchanged blows, Prosper continued to ignore Martin's repeated commands to "get down" and "get on the ground," which would have reinforced the impression in a reasonable officer's mind that his words were ineffectual on the suspect.[13]  Prosper was either ignoring Martin's words or was incapable of comprehending them—the vacant look in his eyes, as if "he wasn't all there," and the fact that he had not uttered a single word throughout the encounter would have suggested the latter.  After Martin's taser failed to subdue Prosper, a reasonable officer would also know that he was resilient—that a given degree of force would produce a lesser effect on him, perhaps, than it would on an average person.

The foregoing observations inform the way a reasonable officer would have assessed the danger posed to his person, as well as the defense necessary to mitigate that danger, in the critical moments before Martin fired the deadly shots into Prosper's chest.  At that time, Martin's finger was locked between Prosper's jaws and quickly going numb, and a reasonable officer could well calculate that a plea or warning would be as ineffectual as his previous attempts at communication.

---

[13] When Martin attempted to arrest Prosper after tasing him, Prosper continued to ignore Martin's commands to "turn over, turn over, lie on your back, turn over," and "place his hands behind his back."

22

Nonetheless, Martin pled with Prosper to "please stop" and attempted in vain to pry his finger free.  Martin feared he might lose his finger, rendering him unable to defend himself against further, potentially deadly attacks from Prosper.  In this "tense, uncertain, and rapidly evolving" situation, *Graham*, 490 U.S. at 396–97, 109 S. Ct. at 1872, it was reasonable for Martin to believe that Prosper posed an imminent threat of serious physical harm to his person and that deadly force, without any further warning, was necessary to prevent that harm.  Therefore, the District Court properly concluded that Martin's use of deadly force did not violate Prosper's Fourth Amendment rights.

We also have no doubt that Martin's use of his taser on Prosper was reasonable under the circumstances.  We have held that "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force."  *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (citing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)); *see also Smith*, 834 F.3d at 1294 (determining the use of a taser was reasonable on suspect who was armed with a knife, repeatedly disobeyed commands to drop the knife, and moved toward officers with the knife); *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (concluding the use of a taser was reasonable to effectuate arrest of suspect who was hostile, belligerent, and uncooperative); *cf. McCormick v. City of Fort Lauderdale*, 333

23

F.3d 1234, 1245 (11th Cir. 2003) (holding that use of pepper spray was reasonable when officer "had probable cause to believe that McCormick had committed a violent felony" and "could have reasonably determined that McCormick still posed a threat of further violence"). When an officer uses his taser "against a non-hostile and non-violent suspect who has not disobeyed instructions," however, he violates that suspect's rights under the Fourth Amendment. *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011); *see also Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) (concluding officer used excessive force when he repeatedly tased suspect "into and beyond his complete physical capitulation").

According to Martin's unrebutted testimony, he first used his taser against Prosper after the two exchanged blows, and despite his commands to Prosper to "get on the ground," Prosper continued toward him. It was thus reasonable for Martin to believe that Prosper posed an immediate threat to his person and would not submit to arrest without a fight. Martin's use of his taser in this situation did not violate Prosper's Fourth Amendment rights.

For the foregoing reasons, the District Court committed no error in holding that Martin's use of force did not violate Prosper's Fourth Amendment rights. The Court's entry of summary judgment was proper.

IV.

**AFFIRMED.**

24