[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11675

_____

MARIA DEL CARMEN MONTEFU ACOSTA,
as Personal Representative of the Estate of
Maykel Antonio Barrera, deceased,

Plaintiff-Appellant,

*versus*

MIAMI-DADE COUNTY,
LAWRENCE BALLESTEROS,
JORGE FERRER,
CYNTHIA MEAD,
GIOVANNI RODRIGUEZ, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cv-23241-AMC

_____

Before ROSENBAUM, NEWSOM, and LUCK, Circuit Judges.

NEWSOM, Circuit Judge:

When her son died following an interaction with police, Maria Acosta sued (as relevant here) six Miami-Dade officers involved in his arrest, alleging both federal excessive-force claims and state wrongful-death claims. The district court granted summary judgment to the officers, and Acosta appealed that ruling. After considering the parties' contentions, and with the benefit of oral argument, we hold that the district court erred in granting summary judgment (1) to five of the six officers on Acosta's excessive-force claims and (2) to all of the officers on Acosta's wrongful-death claims.

**I**

Here are the pertinent facts:[1] Late in the afternoon on February 27, 2014, Maykel Barrera arrived at the home of his

_____

[1] Typically, at summary judgment, a court "view[s] all the evidence and draw[s] all reasonable inferences in the light most favorable to the non-moving party." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (quotation marks and citation omitted). As explained in text, a procedural wrinkle here alters the landscape slightly. *See infra* at 6–7. The district court found that Acosta's statement of undisputed material facts violated Local Rule 56.1,

girlfriend, Damaisy Rodriguez, acting "paranoid" and "restless." Barrera took Rodriguez's car and left without telling her where he was going.  A few hours later, Rodriguez and Barrera's mother, Maria Acosta, went looking for him.  Acosta called 911 seeking help because she feared that Barrera was "high on drugs."  When Barrera eventually returned to Rodriguez's later that night, Acosta, who was still there, described him as "not okay."  After a confrontation with Barrera, Acosta told Rodriguez to call 911 again.  On the call, Rodriguez said, "Emergency, emergency! . . . Emergency, please!" and then hung up.  When she called back a minute later, she could be heard exclaiming, "Hurry up, please! . . . Relax! . . . [D]on't M[aykel]! . . . Get off me!"  At that point, Barrera took the phone from Rodriguez and threw it at the sofa, and the call disconnected.

Officers were dispatched in "emergency mode" to Rodriguez's home for a "violent dispute on an open line" and a 911 hang-up.  Officers Lawrence Ballesteros, Cynthia Mead, and Jorge Ferrer responded to the call.  On arrival, Officer Mead saw a car parked "strangely" and a man peering out the window from Rodriguez's apartment in an "unusual and erratic manner."  The officers approached the apartment's front door, where they had a tumultuous

---

which governs the filing of such statements.  Rather than accepting the officers' statement as the controlling version, however, *see* S.D. Fla. Local Rule 56.1(c), the court said it would "rely[] on Defendants' Statement to the extent Plaintiff fail[ed] to dispute it with record evidence or to offer contrary evidence."  Accordingly, we recount the facts as reported in the officers' statement except where Acosta's version departs from it.

verbal exchange with Barrera. Eventually, Barrera slammed the front door on Officer Ballesteros and fled out the back. The officers chased Barrera through the neighborhood, yelling for him to stop and calling for backup.

At some point during the chase, the three officers and Barrera came into sight of Demetrius McKenzie, one of Rodriguez's neighbors. Around the same time, Officer Luis Gomez arrived and joined the effort to apprehend Barrera. McKenzie later gave a deposition in which she described the officers' pursuit and Barrera's eventual arrest. In particular, she testified that the officers couldn't handcuff Barrera immediately because he was "fighting them off" by using his elbows in a "jerking" motion. Indeed, she said that Barrera knocked one of the officers down. McKenzie reported that the officers eventually got Barrera on the ground by tasing him while Officer Ballesteros held him in a chokehold. Somehow, she said, Officer Ballesteros and Barrera ended up on the ground, at which point Officers Miguel Maldonado, Giovanni Rodriguez, and Enrique Noriega arrived and began to tase Barrera. Importantly here, McKenzie also recalled that Barrera stopped resisting once he was on the ground. With respect to that detail, she testified as follows:

> What I don't understand, when they got him on the ground and they put him in the yoke, why did they still have to—he was—once they got him on the ground, he was calm. He was okay. Once the other one came and they had him in the yoke and put it— they didn't have to do all that, because the man was

gone.   All they had to do was put the cuffs and stand him up.   Instead, no, all them jumped out they car, about six of them, and they was Tasing the man.

A second witness to the events, Gwendolyn Flowers, also gave a deposition describing what she saw.  After the officers initially tased Barrera, she testified, he fell, "and [the officers] went to kicking him and stuff like that."  Flowers was uncertain how many officers kicked Barrera or how many times they did so, but she said that Barrera wasn't resisting when he was on the ground and that "[h]e was just—he was just laying there."

Paramedics arrived on the scene a few minutes after the officers had handcuffed Barrera and placed him in a squad car.  When the paramedics took Barrera's vital signs at 11:30 p.m. and then again at 11:34 p.m., they measured his pulse and respiratory rates as well as his blood pressure.  But at 11:36 p.m., Barrera went into respiratory arrest and lost his pulse.  The paramedics took Barrera to Jackson Memorial Hospital, but the doctors there designated him "DNR" because they determined that he was unlikely to survive—he had bruises all over his body as well as intracranial and anoxic brain injuries.  Barrera died at the hospital.

## II

Acosta filed a complaint in state court against the officers involved in the incident as well as Miami-Dade County Police Chief J.D. Patterson Jr., the Miami-Dade Police Department, and Miami-Dade County.  Specifically, Acosta alleged (1) that by tasing and kicking Barrera when he was on the ground and had stopped

resisting the officers used excessive force in violation of the Fourth Amendment and (2) that all defendants were liable for Barrera's death under Florida's Wrongful Death Act, Fla. Stat. § 768.19.

After timely removing Acosta's action to federal court, the defendants moved to dismiss for failure to state a claim. The district court dismissed Sergeant Patterson, Miami-Dade Police Department, and Miami-Dade County, but it denied the individual officers' motions.[2]

Following discovery, the officers filed a motion for summary judgment to which they appended a statement of undisputed material facts. Acosta opposed the officers' motion and submitted her own statement of undisputed facts.[3] The district court found that Acosta's statement violated Local Rule 56.1, which governs the filing and content of such statements. Rather than deeming the officers' statement admitted, however, *see* S.D. Fla. Local R. 56.1(c), the court stated that it would consider "the entire factual record pertinent to summary judgment, relying on Defendant's Statement to the extent Plaintiff fail[ed] to dispute it with record evidence or to offer contrary evidence." Considering the entire record, and "constru[ing] it in a light most favorable to [Acosta]," the district

---

[2] Acosta had also brought a state-law negligence claim against the Miami-Dade Police Department and Miami-Dade County, but that claim evanesced when the district court dismissed those defendants. Acosta doesn't seek to resurrect that claim on appeal.

[3] Acosta voluntarily dismissed Officer Gomez, whom Barrera had knocked to the ground.

court held (1) that the officers didn't use excessive force in violation of the Fourth Amendment and were therefore entitled to qualified immunity and (2) that there were no genuine issues of material fact regarding Acosta's wrongful-death claim and that Barrera's death was caused by a drug overdose, not by the officers' use of force.

This is Acosta's appeal.

### III

"We review the district court's grant of summary judgment de novo, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (quotation marks and citation omitted and alterations adopted). "Summary judgment is warranted where the evidence in the record presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Id.* (quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(a). More particularly, and significantly here, we have held that we will "determine the legal question of whether the defendant is entitled to qualified immunity" using the plaintiff's version of the facts. *Draper v. Reynolds*, 369 F.3d 1270, 1274 (11th Cir. 2004) (quotation marks and citation omitted). Of course, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, so they are not appropriate determinations to make at the summary judgment stage." *Butler v.*

*Gualtieri*, 41 F.4th 1329, 1334 (11th Cir. 2022) (quotation marks and citation omitted).

## IV

Acosta first argues that the district court erred when it granted summary judgment to the officers on her excessive-force claim on the ground that they are entitled to qualified immunity from suit. In particular, Acosta contends that when the officers tased and kicked Barrera as he lay in a non-resistant state on the ground, they violated his "clearly established" Fourth Amendment rights. Taking the facts in the light most favorable to Acosta, we will first assess whether the officers' conduct violated the Constitution. Concluding that they did, we will then analyze whether Barrera's right not to be tased and kicked after he had been subdued and was no longer resisting was sufficiently "clearly established" to put the officers on notice that their actions were unlawful.

★   ★   ★

In relevant part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . shall not be violated." U.S. Const. amend IV. And while a police officer's power to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," it is now well settled that the "[f]reedom from unreasonable searches and seizures under the Fourth Amendment encompasses the right to be free from excessive force during the course of a criminal apprehension." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015)

(quotation marks and citations omitted). We assess excessive-force claims using an objective-reasonableness standard. *Id.*

The officers involved in Barrera's arrest assert that they are entitled to qualified immunity. All here agree that the officers were acting within the scope of their discretionary authority when they apprehended Barrera. Accordingly, Acosta bears the burden of demonstrating both (1) that the officers "violated a statutory or constitutional right" and (2) "that the right was clearly established at the time of the challenged conduct." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). A reviewing court may consider the merits and clearly-established prongs in either order, and "an official is entitled to qualified immunity if the plaintiff fails to establish either." *Piazza v. Jefferson County*, 923 F.3d 947, 951 (11th Cir. 2019). For reasons we will explain, we hold that Acosta has met her burden with respect to both prongs.

## A

We will first consider whether Acosta has shown that the arresting officers violated Barrera's Fourth Amendment right to be free from excessive force. At least at this stage of the proceedings, we conclude that she has.

To determine whether an officer used excessive force under an objective-reasonableness standard, we consider a number of factors: "[1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he [wa]s actively resisting arrest or attempting to

evade arrest by flight," *Graham v. Connor*, 490 U.S. 386, 396 (1982), as well as "[4] the need for the application of force, . . . [5] the relationship between the need and amount of force used, and . . . [6] the extent of the injury inflicted," *Mobley*, 783 F.3d at 1353 (quotation marks and citation omitted). For better or worse, this multifactor analysis entails an assessment of the totality of the circumstances. *See Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002).

Although not all of the factors here point in the same direction, the totality of the circumstances—particularly taking the facts in the light most favorable to Acosta—leads us to conclude that the officers used excessive force when they tased and kicked Barrera while he was subdued, on the ground, and no longer resisting arrest. We will address the excessive-force factors in turn.[4]

**1**

*Severity of the crime*. This factor tends to support the officers, albeit only slightly. Even under the version of the facts most favorable to Acosta, Barrera struck one officer with a door at Rodriguez's apartment and later resisted apprehension by knocking another officer to the ground. Both acts constitute felonies under Florida law. *See* Fla. Stat. §§ 784.03(1), 784.07(2). Even if we were to assume that the responding officers had no reason to believe a

---

[4] The parties agree that during the relevant timeframe, Officer Ballesteros had Barrera in a chokehold on the ground and, therefore, that he couldn't have tased or kicked Barrera after he fell. *See* Oral Arg. at 30:44–31:00. Because Acosta's excessive-force claim pertains to the tasing and kicking, we affirm the district court's grant of summary judgment for Officer Ballesteros.

crime had been committed when they initially arrived at Rodri-guez's apartment, *see* Doc. 71-10 at 62:5–9 (Officer Ballesteros: "I had no idea what had been committed inside the apartment."), we think that, on balance, the severity factor favors them.

**2**

*Threat to officer safety.* On balance, this factor favors Acosta. To be sure, Barrera posed some threat to the officers early in the encounter, when he was slamming doors, throwing elbows, etc. But he posed no "immediate threat," *Graham*, 490 U.S. at 396, at the time the officers administered the tases and kicks that underlie Acosta's constitutional claim—which, construing the facts in the light most favorable to Acosta, occurred after Barrera had been taken to the ground and subdued and was no longer resisting.

**3**

*Resisting or evading arrest.* It's true, as the district court noted, that the only way that the officers got Barrera on the ground was by tasing him. Even so, on the facts as we must construe them, Barrera wasn't actively resisting arrest or attempting to flee once he was taken to the ground and subdued. And the fact that it took tasing to get Barrera on the ground doesn't justify additional tases or kicks once he was there and had stopped resisting. To be sure, our analysis must "embody allowance for the fact that police offic-ers are often forced to make split-second judgments." *Graham*, 490 U.S. at 396–97. But if even witnesses watching from a distance could tell that Barrera was "calm," "okay," "just laying there," and "gone" after he'd been subdued—as McKenzie and Flowers

testified—we have to assume that a reasonable officer would have seen and appreciated the same.

**4**

*Need and amount of force used.* The fourth and fifth factors typically travel together. As for the fourth, taking the facts in the light most favorable to Acosta, even assuming that there was a "need" to use force in order to get Barrera to the ground, that need dissipated once he was on the ground and, again, was "calm," "okay," "just laying there," and "gone." The fifth factor likewise favors Acosta. If at the critical juncture there was no need to use any meaningful force, then the "relationship" between that non-need and the amount of force used is zero. Any further tasing or kicking at that point was unnecessary.

**5**

*Extent of injury.* The final factor is inconclusive. Although Barrera was hospitalized and died after his encounter with the officers, it remains an open question—at least at this point in the proceedings—whether the tases and kicks they administered after he was taken to the ground caused his death. (More on that to come.)

★   ★   ★

Considering the totality of the circumstances, and viewing the facts in the light most favorable to Acosta, we hold that the arresting officers violated Barrera's Fourth Amendment right to be free from excessive force.

**B**

For qualified-immunity purposes, the question thus becomes whether, in tasing and kicking Barrera once he was on the ground and had been subdued, the officers violated "clearly established law." *See Mikko*, 857 F.3d at 1146. For the reasons that follow, we hold that they did.

To determine whether a right was clearly established at the time an officer acted, we ask "whether the contours of the right were sufficiently clear that every reasonable officer would have understood that what he was doing violates that right." *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021) (citing *al-Kidd*, 563 U.S. at 741). A plaintiff can demonstrate that a right was "clearly established" by showing any of the following:

> (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Id.* (quotation marks and citation omitted).

The district court observed in a footnote that Acosta hadn't pointed to any precedent on the books as of February 2014 that would have put the officers on notice that their conduct was unlawful. *See* Doc. 129 at 32–33 n.6. Respectfully, we disagree.

The district court's error, we think, resulted from its misframing of the governing constitutional principle. It's true, of course, as the district court noted, that an officer may lawfully use force against a suspect who never submits or ceases to resist arrest. *See id.* (first citing *Bussey-Morice v. Gomez*, 587 F. App'x 621, 624, 629–30 (11th Cir. 2014), and then citing *Hoyt v. Cooks*, 672 F.3d 972, 975, 980 (11th Cir. 2012)). The problem is that, here—again, at least taking the facts in the light most favorable to Acosta—Barrera *did* cease resisting. To repeat, according to both McKenzie and Flowers, once Barrera was on the ground, he was "calm," "okay," "just laying there," and (most emphatically) "gone."

The controlling question, therefore, is whether it was clearly established in February 2014 that a police officer is prohibited from using force against a *non*-resisting suspect. It was. Indeed, the district court seems to have recognized as much. In its order denying the officers' motion to dismiss, the district court itself acknowledged that before February 2014, it was "established law that 'government officials may not use gratuitous force against a prisoner who has already been subdued'"—and, therefore, that "[n]o reasonable officer could have concluded that continued and prolonged violence against Barrera was necessary once he had been subdued." Doc. 37 at 7–8. For that proposition, the court (accurately) cited several of our decisions, all of which predated the events in question here. *See id.* (first quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1333 (11th Cir. 2008), then citing *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000), then citing *Skrtich v. Thornton*, 280 F.3d 1295, 1304 (11th Cir. 2002), and then citing *Lee*, 284 F.3d at

1200).  Even in its order *granting* the officers' summary judgment motion, the district court acknowledged that "[t]he Eleventh Circuit has 'held a number of times that severe force applied *after* the suspect is safely in custody is excessive.'"  Doc. 129 at 29 (quoting *Mobley*, 783 F.3d at 1356).  Just so.

Our decision in *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997)—which was issued more than 15 years before the events in question here—is particularly instructive.  In that case, a suspect had raised a bat at a police officer and then fled before eventually becoming docile and submitting to arrest.  *Id*. at 1418.  In the process of handcuffing the suspect, an officer exerted enough force to break the suspect's arm.  *Id*.  We characterized the circumstance that the case presented as one in which an officer "subjected a previously threatening and fleeing arrestee to nondeadly force after the arrestee suddenly became docile."  *Id*. at 1419.  Like this case, *Mattox* arose on summary judgment, so the court there—as we must here—indulged the plaintiff's version of the facts.  And because the plaintiff said that he hadn't been resisting at the critical juncture, we held that the officer's use of force was "obviously unnecessary to restrain even a previously fractious arrestee."  *Id*. at 1420.  So too here.

*Mattox*, *Priester*, *Lee*, and *Hadley* control our decision.  We hold that it was clearly established in February 2014 that an arresting officer may not use gratuitous force on a non-resisting suspect who no longer poses a threat to his safety.  In concluding otherwise, the district court misstepped.

★ ★ ★

We hold that the district court erred both in rejecting Acosta's Fourth Amendment claim on the merits and in concluding that no then-existing law clearly established the unlawfulness of the officers' conduct. Accordingly, we vacate that part of the district court's order.

V

Acosta separately argues that the district court erred when it granted summary judgment to the officers on her state-law wrongful-death claim because, she says, there remain genuine issues of material fact about the cause of Barrera's death.

Under Florida law, a negligence-based wrongful-death claim entails four elements: "(1) the existence of a legal duty owed to the decedent, (2) breach of that duty, (3) legal or proximate cause of death was that breach, and (4) consequential damages." *Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783 (Fla. 1st Dist. Ct. App. 2003). The plaintiff bears the burden of proving causation, *see Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2004), but she needn't necessarily submit expert testimony to do so, *see Claire's Boutiques v. Locastro*, 85 So. 3d 1192, 1195 (Fla. 4th Dist. Ct. App. 2012). Florida courts follow the "more likely than not" standard of causation and thus require proof that the defendant's conduct probably caused the plaintiff's injury. *Gooding v. University Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

With respect to an issue on which the plaintiff will bear the burden of proof at trial—as Acosta will here with respect to

causation—the defendant bears the burden at summary judgment of showing either (1) that there is an "absence of evidence to support the [plaintiff's] case" or (2) that the plaintiff "will be unable to prove [her] case at trial." *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). To survive summary judgment, Acosta therefore "must come forward with enough evidence sufficient to withstand a directed verdict motion." *Id.* And a plaintiff can defeat a directed verdict when "there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (quotation marks and citation omitted).

The district court granted summary judgment for the police officers because it said that it was "left with the unrebutted opinion of three experts who attest[ed] that Barrera died from a drug overdose." Doc. 129 at 25. The court acknowledged that Acosta had offered some evidence to the contrary but found it insufficient. According to the district court, Acosta offered only "first 'impressions' from responding EMS personnel who did not opine on Barrera's cause of death" and a "vague reference to a statement" made by Barrera's treating physician. *Id.* at 24. Ultimately, the district court held that neither of these—nor a toxicologist whom Acosta's lawyer had retained—provided legally sufficient evidence regarding Barrera's cause of death. *Id.*

On appeal, Acosta contends that, taken together, (a) Barrera's medical records, (b) the expert witnesses' opinions, and (c)

the eyewitness' accounts suffice to preclude summary judgment. We agree. We will address each category of evidence in turn, keeping in mind that they must be understood in combination.

## A

Acosta points to multiple entries in Barrera's medical records that she says rebut the officers' contention that they didn't cause Barrera's death. First, Barrera's CT scan showed that he suffered a subdural hematoma—a fact that flatly contradicted the officers' expert witness's testimony that while a subdural hematoma is a symptom of lethal beatings, Barrera didn't have one. Second, Barrera's records listed extensive injuries to his body, including probe marks on his chest and back and contusions all over his body. Third, his treating physicians reported that he had an "intracranial injury"—in particular, a "severe traumatic brain injury that was most likely nonsurviva[ble]." Finally, Barrera's records indicated that his immediate cause of death was "[m]ultiple [b]lunt [f]orce [t]rauma" and that the underlying cause was "[a]noxic [b]rain [i]njury."

It's true, of course, that Barrera's medical records were prepared without the benefit of the post-mortem drug-toxicology analysis that a medical examiner later performed. And it's true that Barrera's anoxic brain injury *could* have been caused by a drug overdose. Even so, when understood in the light of Barrera's other physical injuries, we conclude that Acosta has carried her burden to show that the medical records support a reasonable inference

that Barrera died from a subdural hematoma caused by blunt-force trauma.

## B

Acosta also points to expert testimony—both the officers' and her own. One of the officers' experts opined, for instance, that the drugs in Barrera's system and his "extreme exertion and resistance" made his abnormally enlarged heart more volatile and that this "combination of events" more likely than not caused his death. From that evidence, the district court reasoned that Barrera's death wasn't caused by a taser or any other force-related injuries. But we agree with Acosta that a jury could reasonably conclude that the officers' expert's reference to Barrera's "extreme exertion and resistance" was attributable to *both* the officers' tases and kicks *and* to his own struggling.

For her part, Acosta's expert forensic toxicologist didn't certify a cause of death, but she did testify that Barrera's toxicology report didn't support a finding that he died of overdose toxicity. So while she didn't pinpoint tasing or kicking as the cause of Barrera's death, she did purport to eliminate an alternative. Even if only marginally, we agree with Acosta that the toxicologist's opinion, especially when combined with the other documentary and expert testimony in the record, supports a reasonable inference that the officers' actions caused Barrera's death.

## C

Finally, Acosta contends that the eyewitnesses' testimony supports a reasonable inference that the officers' tases and kicks

caused Barrera's death.  Specifically, she cites McKenzie's and Flowers's accounts that Barrera was unconscious and "limp" when the paramedics arrived on the scene.  Again, we think that evidence, even if only marginally and as part of a larger whole, could support a reasonable inference that the officers' conduct contributed to Barrera's death.

★  ★  ★

To be sure, no single piece of evidence alone proves that the officers' tases and kicks caused Barrera's death.  But when considered together, the evidence indicates "that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions."  *Christopher*, 449 F.3d at 1364.  And that's enough to get over the directed-verdict bar—and, in turn, to survive summary judgment.[5]

In the end, Acosta may well lose her wrongful-death claim on the merits—a jury might conclude that the officers have the stronger evidence regarding Barrera's cause of death.  But at least at the summary-judgment stage, where we must construe the facts in the light most favorable to Acosta, she has done enough to go to trial.  Accordingly, we hold that the district court erred in granting

---

[5] To be clear, the district court's emphasis on Acosta's lack of expert evidence directed to the cause of Barrera's death is misplaced.  Acosta didn't have to present expert testimony to show causation.  *See Claire's*, 85 So. 3d at 1195.  All she needed was enough evidence to survive a directed verdict probing whether she offered "proof that the [defendants'] negligence probably caused" Barrera's death.  *Gooding*, 445 So. 2d at 1018.

summary judgment on Acosta's wrongful-death claim, and we vacate that part of the court's order.

## VI

For the foregoing reasons, we affirm the district court's grant of summary judgment on Acosta's excessive-force claim against Officer Ballesteros, vacate the grant of summary judgment on her excessive-force claims against the other officers, and vacate the grant of summary judgment on her state-law wrongful-death claim against all the officers.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED** in part for further proceedings consistent with this opinion.