[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-13588

Non-Argument Calendar

_____

TRAVIS ROE,
individually,

                                                    Plaintiff-Appellant,

*versus*

HOWARD E. FRYER,
in his individual capacity, et al.,

                                                    Defendants,

CLINT REDMOND,
Deputy,
MARK MAERTZ,
Deputy,

SHERIFF, CLAY COUNTY,
a governmental entity
a.k.a. Michelle Cook,

                                                    Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:22-cv-00971-MMH-LLL

————————————————

Before LAGOA, KIDD, and BLACK, Circuit Judges.

PER CURIAM:

Travis Roe appeals the district court's order granting summary judgment to defendants Clint Redmond and Mark Maertz, officers who were employed by the Clay County Sheriff's Office (CCSO).  Roe argues the district court erred by concluding that Redmond and Maertz were entitled to qualified immunity as to his Fourth Amendment excessive-force claims.  Those claims are based on events that occurred during Roe's arrest for murder, during which Roe asserted that the defendants unreasonably kicked him in the knee, struck him with a firearm, tackled him, hit him numerous times while he was on the ground, and pressed knees

into his neck and back.  After review,[1] we affirm in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

We recite the facts of this case drawing all inferences in the light most favorable to Roe as the non-movant except where such inferences are blatantly contradicted by video evidence.  *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) ("Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account."); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  There are two recordings of Roe's arrest: a video taken by a surveillance helicopter and security camera footage from the location of the arrest.

In August 2020, the CCSO obtained an arrest warrant for Roe for murder.  The murder victim was beaten to death with a blunt object, and a confidential informant related that Roe and multiple of his brothers, among others, were responsible.  Before executing the warrant, the CCSO held a briefing and devised an operational plan for Roe's arrest.  During that briefing, it was

---

[1] "We review *de novo* a grant of summary judgment on the basis of qualified immunity, drawing all inferences and viewing all evidence in the light most favorable to the nonmoving party."  *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1352 (11th Cir. 2015).

advised that Roe was in possession of multiple firearms, including a submachine gun, which he typically carried on his person or in his vehicles. It was also relayed that Roe and his family had a hatred of law enforcement, that Roe was known to be violent, and that he was a member of the Aryan Brotherhood, a white supremacist gang.[2] Some of the officers involved in Roe's arrest had also recently executed a search warrant at the home of Roe's father, and during that operation one of Roe's family members or close friends who lived nearby had exhibited hostility to the officers.

On the morning of August 27, 2020, Roe left his house to drive his wife to work and his kids to school. After he dropped his kids off, he started to drive to his parents' house, as he usually did every day. On his way, CCSO officers began to follow him in unmarked vehicles. Redmond, who was driving the vehicle immediately behind Roe, attempted to pass Roe to initiate a traffic stop, but Roe did not let him pass. Redmond then decided to initiate a Precision Immobilization Technique (PIT) maneuver to stop Roe by running into the back of his truck and forcing him to lose control. The maneuver was unsuccessful, as Roe maintained control of his vehicle and drove away with Redmond following behind him. Redmond then unsuccessfully attempted a second PIT

---

[2] Roe denied owning a firearm and belonging to the Aryan Brotherhood, but he did not submit any evidence controverting the defendants' statements that they had received such information prior to his arrest.

24-13588                Opinion of the Court                 5

maneuver, after which Roe turned into a driveway leading up to his parents' house.[3]

Upon entering the driveway, Redmond drove into the back of Roe's car, bringing him to a stop. Redmond and Roe got out of their cars at approximately the same time. Redmond pointed a pistol at Roe, and Roe held his hands up in the air with his palms open. Redmond told Roe to turn around and put his hands behind his back, but Roe continued to walk towards Redmond with his hands in the air. Redmond approached Roe with his gun drawn.

When the two were within arms' reach, Redmond kicked Roe in the knee. Roe then lowered his hands and turned his body away from Redmond. Redmond grabbed Roe by the shirt with his left hand and struck Roe with his firearm, which he was holding in his right hand. Roe fell to the ground.

After Roe fell down, Maertz, who was in one of the vehicles behind Redmond, got out of his car and ran up to Roe.[4] Roe stated

---

[3] Roe testified during his deposition that he was unaware that the officers were following him until after he turned into his parents' house, and that the officers never turned on their emergency lights or sirens. The former statement is controverted by the video evidence showing Redmond attempting to initiate two PIT maneuvers. As to the latter statement, video evidence shows that at least one of the vehicles following Roe had its emergency lights turned on when it entered his parents' driveway. Also, in an interview prior to his deposition, Roe acknowledged that the police had activated their emergency lights and sirens during the pursuit.

[4] The remainder of the relevant events is largely obscured in both videos. In the security camera footage, all that can be seen of Maertz is the top of his body moving up and down above where Roe fell, but Roe himself and

6                       Opinion of the Court                    24-13588

during his deposition that Maertz tackled him to the ground.  Roe landed face down with his hands extended straight out in front of him above his head on the ground, "superman style," and did not move.  Maertz was on top of Roe and punched him approximately 34 to 37 times in his face.  Roe told Maertz "all right, enough," and asked Maertz to stop hitting him.  Maertz told Roe, "shut up you piece of shit," and continued to punch him.  After Maertz stopped punching, he told Roe to put his hands behind his back to be hand-cuffed, and Roe complied.[5]

Once Roe was handcuffed, Maertz did not hit him anymore, but Maertz placed one knee in the middle of Roe's back and one knee on the back of his neck for approximately one minute.  Roe told Maertz that he was having trouble breathing, and Maertz re-plied, "shut up, you're not black," and pushed harder, causing Roe to feel a pop in his neck.  While this was happening, other individu-als came out of Roe's parents' house.  Roe was soon after taken to a police car, and the officers left the scene with him.

---

Maertz's lower body cannot be seen.  The relevant events can briefly be seen in the helicopter video, but the video is zoomed out too far and too low quality to make out exactly what is happening.

[5] Maertz testified in his deposition that he observed Roe throw something un-der his car when he fell, and that Roe had his hands underneath his body while lying on the ground.  He also stated that he "delivered several knee strikes and scapula hammer fists" to Roe until he placed his hands behind his back.  The officers never confirmed whether Roe had thrown anything under his car.  At this stage of the proceedings, we must accept Roe's version of the facts. *See Mobley*, 783 F.3d at 1352.

24-13588               Opinion of the Court                    7

When he was taken to jail, Roe received medical attention for his injuries, including an x-ray and CAT scan. He reported bruising and swelling in his right eye, multiple broken teeth, and pain in his neck, ear, jaw, and fingers. The x-ray did not show any evidence of a fracture, but the CAT scan showed evidence of a "prior right [zygomatic] fracture deformity." Roe also stated that he suffered from panic attacks.

Roe filed an internal complaint with the CCSO for use of excessive force, and the CCSO conducted an investigation. Ultimately, Internal Affairs exonerated Redmond and Maertz of the allegations of excessive force, but it concluded that Redmond had violated internal policy by striking Roe with his firearm because it was an unauthorized tactic.

Roe then filed a 42 U.S.C. § 1983 complaint[6] against Redmond and Maertz, arguing they violated the Fourth Amendment during his arrest by utilizing excessive force and failing to intervene in each other's use of force. He also brought state law claims of assault, battery, and intentional infliction of emotional distress against them.[7]

Redmond and Maertz moved for summary judgment, arguing they were entitled to qualified immunity as to Roe's Fourth Amendment claims. On October 25, 2024, the district court

---

[6] The operative pleading is Roe's fourth amended complaint.

[7] Additionally, Roe asserted multiple claims against Clay County Sheriff Michelle Cook, but he consented to the dismissal of those claims.

granted summary judgment to Redmond and Maertz because it determined they were entitled to qualified immunity. Specifically, it concluded that (1) Redmond and Maertz did not use excessive force in violation of the Fourth Amendment during Roe's arrest, (2) Roe failed to point to any authority indicating that Redmond and Maertz had violated a clearly established constitutional right, and (3) neither Redmond nor Maertz had a duty to intervene in the other's use of force. The court then declined to exercise supplemental jurisdiction over Roe's remaining state law claims.

## II. DISCUSSION

Roe argues that the district court erred by granting summary judgment to Redmond and Maertz as to his excessive-force claims because (1) they used excessive force in violation of the Fourth Amendment during his arrest, and (2) they violated a clearly established constitutional right.[8] "Summary judgment should be granted only if the evidence of record yields no genuine dispute of material fact, and the moving party is entitled on the undisputed material facts to judgment as a matter of law." *Hinson v.*

---

[8] In his brief, Roe only challenges the district court's ruling as to his excessive-force claims, so he has abandoned any challenge as to the remainder of the October 25 order. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680-81 (11th Cir. 2014) (concluding that a party abandons a claim "when he does not plainly and prominently raise it" in his appellate brief (quotation marks omitted)). That includes any challenge to the district court's grant of summary judgment to the defendants on the failure-to-intervene claims and the court's decision not to exercise supplemental jurisdiction over the state law claims.

*Bias*, 927 F.3d 1103, 1115 (11th Cir. 2019); *see also* Fed. R. Civ. P. 56(a).  We address Roe's arguments as to Redmond and Maertz in turn.

## A.  Redmond

Roe argues the district court erred by concluding that Redmond was entitled to qualified immunity.  "Qualified immunity shields a government official from liability unless he violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019) (quotation marks omitted).  "An officer asserting a qualified-immunity defense bears the initial burden of showing that he was acting within his discretionary authority." *Id.* (quotation marks omitted).  "The term discretionary authority covers all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Hinson*, 927 F.3d at 1116 (quotation marks omitted).  Redmond and Maertz were acting within their discretionary authority when they arrested Roe because "they undertook all the challenged actions while on duty as police officers conducting arrest and investigative functions." *Id.*

Once an officer meets his initial burden of showing that he was acting within his discretionary duty, to defeat a qualified-immunity defense the plaintiff must show that "(1) the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged violation." *Piazza*, 923 F.3d at 951.  "We may

consider these two prongs in either order; an official is entitled to qualified immunity if the plaintiff fails to establish either." *Id.*

Roe asserts that Redmond violated the Fourth Amendment during his arrest. Specifically, he contends that Redmond used excessive force when Redmond kicked him in the knee and struck him in the face with his firearm.

"Freedom from unreasonable searches and seizures under the Fourth Amendment encompasses the right to be free from excessive force during the course of a criminal apprehension." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (quotation marks omitted). When analyzing a claim of excessive force, we apply "an objective-reasonableness standard" and assess "the totality of the circumstances." *Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1239 (11th Cir. 2024). In doing so, we consider the following factors: (1) "the severity of the crime at issue," (2) "whether the suspect posed an immediate threat to the safety of the officers or others," (3) "whether he was actively resisting arrest or attempting to evade arrest by flight," (4) "the need for the application of force," (5) "the relationship between the need and amount of force used," and (6) "the extent of the injury inflicted." *Id.* (quotation marks and alterations omitted).

After weighing all of the relevant factors and considering the totality of the circumstances, we agree with the district court that Redmond did not violate the Fourth Amendment during Roe's arrest. The first of the factors weighs strongly in Redmond's favor because Roe was being arrested for murder.

As to the second factor, Roe argues he did not pose an immediate threat to the officers once he got out of his car because he was holding his hands up in the air and walking slowly. We disagree. We must consider the totality of the circumstances from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Viewing the facts from that perspective, we conclude that Roe posed a potential threat to the officers at the time of his arrest.

Prior to the day of his arrest, the officers were informed that Roe carried firearms on his person and in his vehicles, had a hatred of law enforcement, and was a member of the Aryan Brotherhood. Further, the arrest occurred at Roe's parents' house, a location where some of the officers had experienced hostility when they previously executed a search warrant there. Based on these facts, it would not be unreasonable for the officers to perceive Roe as a potential threat to their safety leading up to the arrest.

As to the events of the arrest itself, while Roe held his hands up in the air after getting out of his car, he did not comply with Redmond's command to turn around and put his hands behind his back and instead walked directly towards Redmond in a manner that could reasonably be interpreted to be threatening in the heat of the moment, especially in light of the information Redmond had received about Roe. Then, after Redmond kicked Roe in the knee in order to destabilize him, Roe lowered his hands and turned his body away from Redmond in a way that could reasonably be interpreted as an attempt to reach for a weapon located in his

waistband.  Based on these considerations, it would be reasonable for an officer on the scene to believe that Roe potentially posed an immediate threat to their safety based on a "split-second judgment[]."  *See id.* at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

The third factor also weighs in Redmond's favor.  Roe denies that he fled from the officers in his car.  However, we do not accept Roe's version of the events because video evidence shows that Redmond attempted on multiple occasions to effect a traffic stop, but Roe continued driving and only stopped once he arrived at his parents' house.  *See Pourmoghani-Esfahani*, 625 F.3d at 1315; *Scott*, 550 U.S. at 380.  Although the pursuit was not protracted and Roe did not appear to drive at an excessively high speed, it would nevertheless have been reasonable for the officers to interpret Roe's actions as an attempt to evade arrest.  Further, once Roe got out of his car, he did not comply with Redmond's commands, and his actions immediately after Redmond kicked him and before he fell to the ground could reasonably be viewed as active resistance.

As to the fourth factor, it was not unreasonable for Redmond to conclude that force was necessary to safely arrest Roe. The above factors indicate that a reasonable officer on the scene could have believed that Roe posed a potential threat and so needed to be immobilized as soon as possible.  We have explained,

"the typical arrest involves some force and injury," so it was reasonable for Redmond to judge based on the "tense, uncertain, and rapidly evolving" circumstances that it was necessary to use some force to arrest Roe. *See Mobley*, 783 F.3d at 1353 (quotation marks omitted); *Graham*, 490 U.S. at 396-97.

The fifth factor also weighs in Redmond's favor. As stated above, it was reasonable for Redmond to believe that he needed to use force to immobilize Roe, and the amount of force he employed, kicking and striking Roe with his firearm once, was not disproportionate to that need. *See Hinson*, 927 F.3d at 1120 (holding officers did not violate the Fourth Amendment by performing a takedown on an arrestee who was suspected of murder, was believed to be armed with a knife, failed to comply with instructions, and was moving towards an unarmed officer). Although an investigation concluded that Redmond violated internal policies by using his firearm to strike Roe, that conclusion does not necessarily mean that the use of force was unconstitutional. *See Charles v. Johnson*, 18 F.4th 686, 701-02 (11th Cir. 2021) (rejecting argument that violation of departmental policy should be considered as an additional factor in excessive-force analysis where other factors established that officer did not engage in unconstitutionally excessive force). Additionally, we disagree with Roe's contention that the hypothetical possibility that Redmond's firearm could have discharged while striking Roe could render an otherwise reasonable use of force excessive.

As to the sixth factor, Roe's injuries were not insignificant, so this factor weighs slightly in his favor. *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (stating that "lacerations, injuries to [the] teeth and jaw, damage to [the] left eardrum, and emotional distress" are not de minimis).

Weighing all of the relevant factors and considering the totality of the circumstances, we conclude that Redmond did not violate the Fourth Amendment during Roe's arrest. Redmond had reason to believe that Roe posed a threat to the officers, Roe fled from the officers in his car, and Roe did not comply with commands and instead walked directly towards Redmond, albeit with his hands in the air. Considering all of these facts, it was not excessive for Redmond to kick Roe in the knee and strike him once in the face with a firearm. Given that Redmond did not violate the Fourth Amendment, he also did not violate any clearly established constitutional law. *See Piazza*, 923 F.3d at 951 ("We may consider these two prongs in either order; an official is entitled to qualified immunity if the plaintiff fails to establish either."). Therefore, Redmond is entitled to qualified immunity as to Roe's excessive-force claim. Accordingly, we affirm the district court's grant of summary judgment as to Redmond.

## B. *Maertz*

Roe argues that Maertz used excessive force in violation of the Fourth Amendment when he (1) tackled Roe to the ground

after Redmond struck him,[9] (2) punched or kicked Roe 34 to 37 times after Roe was lying on the ground, and (3) pressed his knees into Roe's back and neck after Roe was handcuffed. This is a close call, but after weighing the relevant factors and analogous precedent, we conclude that the district court erred by granting summary judgment to Maertz in full.

### 1. Tackle

We conclude that Maertz did not violate the Fourth Amendment by tackling Roe. Much of the above analysis for Redmond's use of force applies equally to Maertz's tackle. When Maertz tackled Roe, a reasonable officer still could have viewed Roe as a potential threat for the reasons discussed above. Although Redmond had just struck Roe with his firearm, causing him to fall over, Roe was not completely subdued at the time that Maertz tackled him, so it was reasonable for Maertz to think it necessary to tackle Roe in order to safely arrest him. *See Hinson*, 927 F.3d at 1120; *Charles*, 18 F.4th at 699-700 (holding that tackling an arrestee who was not obeying commands was a reasonable use of force where the arrestee posed an immediate risk of danger to the officer and

---

[9] The video of the arrest suggests that Maertz may not have tackled Roe to the ground because it appears that Roe had already fallen to the ground before Maertz approached him due to Redmond striking him with his firearm. However, because the video does not blatantly contradict Roe's position that Maertz tackled him in some form, we accept Roe's version of the facts. *See Pourmoghani-Esfahani*, 625 F.3d at 1315; *Scott*, 550 U.S. at 380.

16                     Opinion of the Court                24-13588

himself).  Therefore, we affirm the district court's grant of summary judgment to Maertz as to his tackle.

### 2. Punches

However, we conclude that Maertz violated the Fourth Amendment by punching Roe 34 to 37 times while Roe was lying face down on the ground.  In the October 25 order, the district court did not address this use of force because it found that Roe had failed to argue that it constituted excessive force in his response to the defendants' summary judgment motion.  This conclusion was erroneous because we determine that Roe raised this issue with sufficient clarity in his summary judgment response brief.[10]  Ordinarily, we do not review issues not raised before the district court except under rare circumstances and remand issues that the district court declined to address in the first instance.  *See Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1352 (11th Cir. 2017).  However, we will review this issue at this stage because it is sufficiently preserved

---

[10] It is true that in the argument section of his response brief, Roe's analysis explicitly focused primarily on Redmond's pistol strike and Maertz's use of knee pressure.  However, on multiple occasions throughout the brief, Roe referred to Maertz's punches that were employed while he was lying on the ground.  For example, Roe described Maertz's punches in his summary of the facts, in a section titled "QUESTION BEFORE THE COURT," and in his discussion of his expert witness's opinion, although he sometimes referred to the punches as kicks.  We conclude that these references, in addition to Roe's general arguments that Redmond and Maertz used excessive force during his arrest, which included the assertion that Roe "continued to avoid any aggression by lying prone on the ground with his hands extended in front of him," were sufficient to preserve this issue for appellate review.

for appellate review. *See CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1336-37 (11th Cir. 2017) (reviewing an issue that a district court declined to address in the first instance because the appellant sufficiently preserved it for appellate review).

First, we will explain that Maertz violated the Fourth Amendment by striking Roe many times after he had already been subdued and became compliant. Second, we address that Maertz violated a clearly established constitutional right.

### a. Constitutional Violation

According to Roe, whose account we must accept because this portion of the arrest was not recorded on video, after Maertz tackled him, he lay face down with his hands extended straight out in front of him above his head on the ground, "superman style," and did not move. When Maertz got on top of and started hitting him, Roe told Maertz, "all right, enough," then asked Maertz to stop hitting him and put his hands behind his back as soon as Maertz instructed him to do so. It was only then that Maertz handcuffed Roe.

Of the relevant factors, only factor one strongly weighs in Maertz's favor. Factor two weighs in Roe's favor because, although it would have been reasonable for an officer on the scene to judge that Roe potentially posed a threat when he was walking towards Redmond, the same is not true for when Roe was lying on the ground with his hands spread out in front of him. Maertz argues that we should take into consideration the threat that Roe posed throughout the arrest as a whole rather than just at the time

of the relevant use of force. We agree that is relevant, but it misses the point that the primary focus of factor two is whether Roe "posed an *immediate* threat," that is, whether Roe posed a threat when Maertz was punching him while he was lying on the ground. *See Acosta*, 97 F.4th at 1239 (emphasis added); *see also id.* at 1240 (weighing factor two in the plaintiff's favor because, even though he "posed some threat to the officers early in the encounter," he was no longer a threat at the time that the officers tased and kicked him, as he "had been taken to the ground and subdued and was no longer resisting").

Factor three also weighs in Roe's favor. Maertz argues that Roe was resisting arrest because he was disobeying lawful orders and refused to give his hands up while he was lying on the ground. However, according to Roe, as soon as he fell onto the ground, he did not move or actively resist. Indeed, Roe testified that he provided his hands to be handcuffed as soon as Maertz ordered him to do so. Even though Roe fled from the officers in his car and previously acted in a way that could be interpreted by a reasonable officer as resisting arrest by failing to comply with Redmond's orders, Roe's account indicates that he did not resist or fail to comply once he was on the ground. *See id.* at 1240 (noting that the plaintiff "wasn't actively resisting arrest or attempting to flee once he was taken to the ground and subdued," and "the fact that it took tasing to get [the plaintiff] on the ground doesn't justify additional tases or kicks once he was there and had stopped resisting"). We cannot say that Roe's decision to spread his hands out in front of him constituted resistance when he did not actively attempt to keep his

hands away from Maertz and placed them behind his back as soon as he was ordered to do so.

As to factor four, because Roe did not pose an immediate threat and was not resisting once he was on the ground, it was not reasonable for Maertz to decide that additional force in the form of 34 to 37 punches was necessary to safely effectuate the arrest. Factor five also weighs in Roe's favor because, even if some additional force was warranted, such as placing a knee on Roe or striking him a few times, his use of 34 to 37 punches goes beyond that need, given that Roe was already subdued and compliant at that time.

Our conclusion is supported by analogous precedent. We have held on multiple occasions that gratuitous force used on a handcuffed, subdued arrestee is excessive in violation of the Fourth Amendment. *See, e.g.*, *Hadley v. Gutierrez*, 526 F.3d 1324, 1329-30 (11th Cir. 2008) (holding officer used excessive force by punching in stomach a handcuffed arrestee who was not struggling or resisting); *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (holding officer used excessive force by slamming handcuffed arrestee's head into trunk after stop for traffic violation); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (holding officer used excessive force by kicking arrestee and beating his head on the ground where arrestee was handcuffed and not struggling or resisting). Indeed, we have explained that our excessive-force precedent demonstrates "that the point at which a suspect is handcuffed and poses no risk of danger to the officer often is the pivotal point for

excessive-force claims." *Mobley*, 783 F.3d at 1356 (quotation marks and alteration omitted).

Our precedent is less clear when it comes to force used against an arrestee who is on the ground but has not yet been handcuffed. In *Mobley*, the plaintiff, who was in his car preparing to smoke crack cocaine, was approached by an officer. *Id.* at 1350. Fearing that he was being robbed, the plaintiff drove away and struck the officer with his car. *Id.* After crashing, the plaintiff ran into a pond but began to approach nearby officers who were pursuing him once he realized he was surrounded. *Id.* at 1350-51. One of the officers grabbed the plaintiff by the hair, shoved him to the ground, and ordered him to surrender his hands while other officers struck and kicked him, breaking his nose and teeth. *Id.* at 1351. The plaintiff covered his face to protect it from the officers' blows, and the officers repeatedly tased him. *Id.* We held that the officers did not use excessive force because of the seriousness of the plaintiff's offense, his attempt to evade capture, and his refusal to give his hands up to be handcuffed. *Id.* at 1354-57. We explained, "force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive." *Id.* at 1356.

In *Acosta*, officers received a 911 call for a "violent dispute," and when the officers arrived on the scene, they encountered the plaintiff who began to act erratically and ran away. *Acosta*, 97 F.4th at 1236-37. When the officers caught the plaintiff, they could not handcuff him because he was fighting them off with his elbows and

knocked one of them down. *Id.* at 1237. The officers got the plaintiff to the ground by tasing him and putting him into a chokehold. *Id.* Once he was on the ground, the plaintiff stopped resisting, but the officers tased and kicked him. *Id.* It was not until after this that the officers handcuffed him. *Id.* Later that night, the plaintiff died, although it was unclear whether he died from his injuries or due to an overdose. *Id.* at 1237, 1241-44. We held that the arresting officers used excessive force by tasing and kicking the plaintiff while he was subdued on the ground and no longer resisting arrest. *Id.* at 1239-41. We explained that our precedent clearly established that "an arresting officer may not use gratuitous force on a non-resisting suspect who no longer poses a threat to his safety." *Id.* at 1241-42.

The factual distinctions between *Mobley* and *Acosta* are expressive of the line that our precedent draws for force used on an arrestee who is on the ground but has not been handcuffed. On the one hand, we have held a use of force to be reasonable when it is used against unhandcuffed arrestees who are on the ground but continue to resist arrest or are in a position such that they are not completely subdued and may still pose a threat to officer safety. *See, e.g.*, *Mobley*, 783 F.3d at 1354-57; *Hinson*, 927 F.3d at 1120-21 (holding officer did not use excessive force when he struck unhandcuffed arrestee suspected of murder and thought to be in possession of a knife who was lying on the ground with his hands under his body and was refusing to comply with instructions to provide hands for handcuffing); *Crenshaw v. Lister*, 556 F.3d 1283, 1291-93 (11th Cir. 2009) (holding officers did not use excessive force when they allowed a police canine to bite an unhandcuffed arrestee

31 times where the arrestee was suspected of armed robbery, fled from police into a forest, and was reasonably suspected of being armed and dangerous even though he was lying on the ground and shouting out his location in an apparent attempt to surrender because the arrestee was hidden from view, and the officers had no reason to trust that he would not try to do them harm); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333-35 (11th Cir. 2004) (holding officer did not use excessive force by putting foot on unhandcuffed arrestee's face who was lying on the ground because shots were heard in the area prior to the arrest; arrestee was found to be in possession of a shotgun; he did not drop the shotgun when commanded to do so; and, although he was lying down on the ground, he raised his head, jerked his hand away from a handcuffing attempt, and shoved the officer's foot away from him).

On the other hand, we have held a use of force to be excessive when it is used against unhandcuffed arrestees who are on the ground, are subdued in some way, are not resisting or refusing to comply with orders, and do not pose an immediate threat to officer safety. *See, e.g.*, *Acosta*, 97 F.4th at 1239-42; *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (holding officer used excessive force by, while on top of the unhandcuffed arrestee who was lying on the ground, breaking his arm while attempting to handcuff him where the arrestee was suspected of possessing cocaine, was holding a baseball bat when the officer first arrived and refused to drop it, and ran away from the officer, but then complied with an order to get on the ground and did not subsequently resist); *see also Sebastian v. Ortiz*, 918 F.3d 1301, 1311 (11th Cir. 2019) ("[I]f an arrestee

demonstrates compliance, but the officer nonetheless inflicts gratuitous and substantial injury using ordinary arrest tactics, then the officer may have used excessive force" even if the arrestee "was initially recalcitrant and even acted aggressively toward the officer.").

This case is more analogous to the latter category of precedent than the former. The critical factor in *Mobley*, *Hinson*, *Crenshaw*, and *Crosby* was that the unhandcuffed arrestees, despite lying on the ground, were not fully subdued in the control of the officers or were resisting arrest in some way such as refusing to give up their hands or moving around to prevent handcuffing. *See Mobley*, 783 F.3d at 1354-57; *Hinson*, 927 F.3d at 1120-21; *Crenshaw*, 556 F.3d at 1291-93; *Crosby*, 394 F.3d at 1333-35. However, like in *Acosta* and *Smith*, once Roe was taken to the ground with Maertz on top of him, he did not move, had his hands out in front of him in a way that did not indicate he was resisting handcuffing, and complied with Maertz's order to place his hands behind his back. *See Acosta*, 97 F.4th at 1239-42; *Smith*, 127 F.3d at 1419-20. Even though he was initially resistant and previously acted in a way that could reasonably be interpreted as dangerous, once Roe was on the ground with Maertz on top of him, subdued, and compliant, it was unreasonable for Maertz to inflict gratuitous injury on Roe by striking him 34 to 37 times. *See Acosta*, 97 F.4th at 1239-42; *Smith*, 127 F.3d at 1419-20; *Sebastian*, 918 F.3d at 1311.

For these reasons, we conclude that Maertz violated the Fourth Amendment by striking Roe 34 to 37 times when Roe was on the ground, subdued, and compliant.

#### b. *Clearly Established*

Maertz argues that, even if he violated the Fourth Amendment, he is nevertheless entitled to qualified immunity because Roe has failed to establish that he violated a clearly established constitutional right. In determining whether a constitutional right was "clearly established" at the time the officer acted, "we ask whether the contours of the right were sufficiently clear that every reasonable officer would have understood that what he was doing violates that right." *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021).

> A plaintiff may show that a right was "clearly established" through: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Id.* (quotation marks omitted). "If a plaintiff relies on case law, the decisions must come from the United States Supreme Court, the Eleventh Circuit, or the highest court of the pertinent state." *Id.* "However it is shown, clearly established law must be particularized to the facts of the case, . . . and must not be defined at a high level of generality." *Id.* (quotation marks and citation omitted).

We disagree with Maertz that his constitutional violation was not clearly established at the time of Roe's arrest in August 2020. In *Acosta*, we held that it was clearly established that "an arresting officer may not use gratuitous force on a non-resisting

suspect who no longer poses a threat to his safety" even if the sus-pect was unhandcuffed and previously posed a threat to officer safety. *Acosta*, 97 F.4th at 1241-42. Even though *Acosta* was decided in 2024, after Roe's arrest, we relied on earlier precedent, including *Smith*, to conclude that the above principle was clearly established in 2014, before Roe's arrest. *See id.* Additionally, we explained in *Sebastian*, which was decided in 2019, that *Smith* established that "if an arrestee demonstrates compliance, but the officer nonetheless inflicts gratuitous and substantial injury using ordinary arrest tac-tics, then the officer may have used excessive force" even if the ar-restee "was initially recalcitrant and even acted aggressively toward the officer." *Sebastian*, 918 F.3d at 1311.

Based on this precedent, we conclude that Maertz violated a clearly established constitutional right and is not entitled to quali-fied immunity. Therefore, we vacate the district court's grant of summary judgment to Maertz as to his 34 to 37 strikes to Roe after he was on the ground and remand for further proceedings on this claim.

### 3. Knee Pressure

Lastly, we conclude that Maertz did not violate the Fourth Amendment by placing his knee on Roe's back and neck after he was handcuffed. Although Roe was not a threat to officer safety after he was handcuffed, it was not unreasonable for Maertz to place his knees on Roe as part of the force ordinarily used to safely effect an arrest. *See Mobley*, 783 F.3d at 1353 ("[T]he typical arrest involves some force and injury." (quotation marks omitted));

*Croom v. Balkwill*, 645 F.3d 1240, 1251-53 (11th Cir. 2011) (holding that pressing knee into plaintiff's back for ten minutes was de minimis use of force not in violation of the Fourth Amendment where the plaintiff was compliant and did not pose a threat to officer safety); *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."). This conclusion is supported by the fact that Maertz's placement of his knee lasted only approximately one minute, and Roe did not submit any evidence indicating that he suffered any injuries to his neck other than some pain.

### III. CONCLUSION

In sum, the district court did not err by concluding that Redmond was fully entitled to qualified immunity and that Maertz was entitled to qualified immunity for tackling Roe and placing his knees on Roe's neck and back. However, the district court erred by concluding that Maertz was entitled to qualified immunity for striking Roe 34 to 37 times while he was on the ground. Therefore, we vacate the district court's grant of summary judgment as to the latter use of force, otherwise affirm the district court, and remand for further proceedings.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**